HETTY H. R. GREEN & another *vs.* WILLIAM W. CRAPO, trustee & executor.

Bristol.    January 20, 1902. — March 1, 1902.

Present: HOLMES, C. J., LATHROP, BARKER, HAMMOND, & LORING, JJ.

*Trust*, Sound discretion of trustee. *Evidence*, Communications between attorney and client, Declarations of deceased persons, Book entries.

Trustees under a will received from the executor in 1870 shares of a manufacturing corporation at $95 a share. The stock paid dividends until 1881 when it stood at $100 a share. The next year it dropped, and continued to go down until in 1885 it became worthless. The trustees were men of good business capacity and experience, their honesty was not disputed, and they were successful in the management of the trust as a whole. On an appeal by a life tenant from a decree allowing the accounts of the trustees, it was *held*, that it did not appear that the trustees were wanting in sound discretion in keeping the stock.

In 1885 and 1886 trustees under a will bought and held bonds of a small western railroad, which did not pay its operating expenses, guaranteed one half each by two great railroad companies between whose roads it ran. Both great companies became insolvent, but one of them in reorganization made a provision for its guaranty which exceeded in value one half of the original investment. On an appeal by a life tenant from a decree allowing the accounts of the trustees, it was *held*, that it did not appear that the trustees were wanting in sound discretion in purchasing the bonds in 1885 and 1886 and in retaining them afterwards.

A testatrix died leaving an undivided half interest in unproductive land which was but a moderate fraction of a large estate. The other half belonged to the life tenant under the will. Nearly all the rest of the trust fund was invested in interest bearing or dividend paying securities. The will directed the trustees to sell all portions of the estate which were unproductive "and which in their judgment ought to be sold." It also directed, that from the rents, profits and income from the property the trustees should pay all taxes, expenses and commissions, "and the balance of said rents, profits and income shall be deemed to be the net income from the said estate ; and I direct the said Trustees to pay the said net income" to the life tenant. During twenty-six years the life tenant received an income of about three and three quarters per cent on the whole property, and in the meantime the capital increased substantially in value. The life tenant during the whole period did not want the land sold and was unwilling to sell her share, and the trustees continued to hold the half interest in the unproductive land. On an appeal by the life tenant from a decree allowing the accounts of the trustees, the life tenant contended that she should be allowed interest on the fair selling value of the land retained. *Held*, that, apart from the definition of net income in the will, the trustees could not be made liable for failing to sell land which they expressly were authorized to keep if they thought it wise, and which practically could not have been sold without the concurrence of the life tenant who refused to give it.

When the privilege of communications between attorney and client has been

waived, by the client being present in court and allowing the attorney to testify to the conversation without objection, and by herself testifying in regard to the conversation, on appeal to a higher court she cannot withdraw her waiver. *Whether* a different rule should obtain with regard to testimony tending to incriminate a witness, *quære.*

*Semble*, that a business letter press copy book of a deceased person may be admissible under St. 1898, c. 535, as containing declarations formerly excluded as hearsay, or possibly as containing entries made in the regular course of business, to show that the letters copied therein had been put in the regular channel for transmission, from which it might be inferred that they had reached their destination. *In this case* the letter press copies had been admitted in the court below in the presence of the appellant and her counsel without objection and she had there testified that she did not receive a part of the letters addressed to her or did not remember having received them. *Also*, in this case the admission of the letters did not affect the result.

APPEAL from a decree of the Probate Court for the County of Bristol allowing twenty several accounts of Edward D. Mandell, deceased, and William W. Crapo, as trustees under the will of Sylvia Ann Howland, William W. Crapo also being the executor under the will of Edward D. Mandell.

The case was heard by *Hammond*, J., who made a decree allowing the accounts except as to certain objections which were sustained by consent. From this decree an appeal was taken by the life tenant under the will and by her son, one of the present trustees. Later a bill of exceptions was allowed. The questions raised are stated by the court. The facts appearing by the record as to the waiver by the life tenant of the privilege as to communications to her counsel were as follows:

The counsel for the petitioners proposed to inquire of Mr. Crapo while he was on the stand as to conversations between him and Mrs. Green before his appointment as trustee and when he was acting as her counsel. The appellants objected on the ground of privilege.

The petitioners thereupon called Mr. Prescott as a witness, who testified that he was present at the hearing in the Probate Court, acting as assistant counsel, and also testified as follows: " *Q.* (By Mr. Knowlton.) Mr. Prescott, was Mr. Crapo on the stand in that court? *A.* Yes, sir. — *Q.* Was he asked about conversations with Mrs. Green prior to his appointment as trustee? *A.* Yes, sir. — *Q.* Was any privilege raised by Mrs. Green or her counsel at that time? *A.* No, sir. — *Q.* Was Mrs. Green

inquired of in reference to her conversations with Mr. Crapo before he was trustee? *A.* Yes, sir. — *Q.* By Mr. Storey? *A.* Yes, sir. — *Q.* She took the stand and swore to it? *A.* Yes, sir."

The justice ruled that the privilege was waived, and, having been waived, could not then be insisted upon, and admitted the evidence.

In accordance with a request of the appellants, the justice made the following report of the facts found by him, so far as material:

"The case was heard by me on the statement of agreed facts hereto annexed, and the oral testimony of William W. Crapo, the petitioner. Upon the testimony of Mr. Crapo I find that all the trustees were men of good business capacity and experience, and that they acted in good faith and for what they believed to be the best interest of the estate as a whole and of the separate interests of the *cestui que trust.* I find also, upon his testimony, that in their attempt to sell their interest in lands owned in common by Mrs. Green, the appellant individually, and the trustees, they were embarrassed by her refusal to join with them and sell the part owned by her individually. I rule that the facts agreed as above stated and my further finding as above stated do not conclusively show as a matter of law that the trustees were negligent, and having so ruled, I find as an inference from the above agreed facts and findings that in the purchase of the bonds of the Leavenworth, Topeka and Southwestern Railroad in 1885 and 1886, and in incurring the expenses on the same as stated in the fourteenth and fifteenth accounts of the trustees, and in the management of the real estate, the trustees were not guilty of negligence in the discharge of their duty, but acted in good faith and with reasonable fidelity."

*S. L. Whipple & H. W. Ogden,* for the appellants.

*H. M. Knowlton & O. Prescott, Jr.,* for the appellee.

HOLMES, C. J. This is an appeal from a decree of the Probate Court allowing. the accounts of the trustees of the will of Sylvia Ann Howland. The case comes here in a slightly irregular form, as a decree was entered by the single justice of this court and an appeal taken while exceptions were pending, as it would seem, since afterwards a bill of exceptions was allowed.

No notice was taken of this inadvertence at the argument, and it is not important. There is no misunderstanding as to the questions intended to be raised. The appellant was given the net income, as defined in the will, of the residue of the estate during her life. She seeks to have an investment of $40,850, made in 1885 and 1886, in fifty bonds of the Leavenworth, Topeka and Southwestern Railroad Company, and an item of $2,087.75, on account of twenty-three shares of the Washington Mills received from the testatrix, disallowed, and to receive interest on the sums with which the trustees are charged. She further contends, as to certain parcels of unproductive real estate received from the testatrix and admitted properly to have been retained, that, as against the remaindermen, she should be allowed interest on the fair selling value, and as to such land as has been sold there should be an apportionment between capital and income. She makes a similar contention as to one hundred and sixty-two shares in the Maine Central Railroad, inventoried in 1870 at $30 a share and sold in 1880 for $47.50 a share, having paid no dividends meantime. There are also certain questions of evidence in connection with the management of the real estate.

The shares in the Washington Mills were turned over to the trustees by the executor on March 1, 1870, at $95 a share. Dividends were received and paid over from that time until January, 1881. In 1881 the stock stood at par. It dropped considerably the next year, and continued to go down until in 1885 the mills failed. It is impossible for us to say on these bare facts that the trustees, who are found to have been men of good business capacity and experience, and whose honesty is not disputed, were wanting in sound discretion simply because their judgment turned out wrong. The success of their management of the trust as a whole makes it probable that their decision not to "sell the stock bought by the [testatrix], upon a falling market" was wise on the knowledge then possessed. *Bowker* v. *Pierce*, 130 Mass. 262, 264. The finding of the single judge must stand.

Then as to the purchase of the fifty railroad bonds. United States bonds were sold in order to make the investment, and the contrast in security was pressed at the argument. But that is only a dramatic circumstance. It was permissible at least, to

sell the United States bonds which stood at a premium and paid but a small return upon their value. At all events it was to the advantage of the life tenant, who, it is testified, wanted the fund to yield more income. The power to sell was not bound up with the reinvestment, as in some English cases. *Norris* v. *Wright*, 14 Beav. 291, 304. The question is whether, having money to invest, the trustees were justified in buying these bonds. The road was a little road connecting the Atchison with the Union Pacific. In 1885 and 1886, as appeared by Poor's Manual, it did not even pay its expenses. But a controlling interest in the stock was owned by those two great railroads and the bonds were guaranteed by them, one half each. These facts went far to warrant a belief that the small road was regarded as necessary by the great ones, and that they stood behind its obligations. It is said that they had no power to guarantee the bonds, but that does not appear, and we cannot assume the fact in the particular case on the strength of a general doctrine. On the contrary, in the reorganization of the Atchison after its collapse, the guaranty was treated as a valid obligation of the company, and the securities received now exceed in value one half of the investment, and pay a larger income than the bonds which were sold to make it.

Again, it is said that the guaranties were of no value and should have been seen to be so because neither the Atchison nor the Union Pacific were paying dividends and their stock stood considerably below par. The value of the Atchison's guaranty appeared in the sequel, and why that of the Union Pacific turned out worthless is left to conjecture. In 1885, at the time of the first purchase, Atchison stock sold at from 67 to 70, and Union Pacific at from 47 to 51. In 1886, at the time of the second purchase, Atchison stock sold at from 91 to 98, and Union Pacific at from 58 to 67. The lowest of these prices indicated that the public estimated the value of both properties as many millions above all liabilities. Both roads were in good financial repute. The bonds, which were four per cent bonds, rose in price with the Atchison and Union Pacific stock, from seventy-seven and one half per cent to eighty-four and a half. Considering the nature of the bonds, the prices indicated a fairly good opinion of them on the part of the public. In the course

of 1885, Chicago, Burlington and Quincy four per cent bonds of different classes could be bought at from about eighty-four to about ninety-three. Moreover, at that time intelligent investors bought many bonds of little roads which were part of the system of a great road, and were backed by it, precisely because on account of their small size they were less known and could be got at a less price than the bonds of the main lines. No doubt some cautious investors would have declined the security of any road that did not pay its own way, but it is within the memory of men still living that guaranties like the one in question were regarded by the general public as a sufficient security. The appellant, who hardly would ask to be considered quite helpless in matters of business judgment, knew of the investment, and received the interest from the bonds without objection or criticism, so far as appears.

A purchase of bonds like those in question would be harder to justify at the present day, after the legal discussions and the financial experiences of the last fifteen years, but realizing as nearly as we can how things looked in 1885 we are of opinion that the justice of this court before whom the hearing was had was right in refusing to find the trustees wanting in the sound discretion that the law requires of them. We think it unnecessary to bolster our conclusion by a reference to the large authority given to the trustees by the will, or to the success of the administration of the trust as a whole. See *Brown* v. *French*, 125 Mass. 410.

The other great question is the claim made against the capital for income in excess of that actually received as such from the real estate. In the first place it is to be noticed that the land was but a moderate fraction of a large estate. The inventory value of the former was $77,330, that of the whole trust fund was $1,350,084.70, nearly all the rest of the trust fund being invested in interest bearing or dividend paying securities. Turning to the will, we find the trustees directed to sell all portions of the estate which are unproductive " and which in their judgment ought to be sold." Thus the testatrix contemplated that it might be that in the trustees' judgment some of the thirty-one parcels in which she was interested ought not to be sold, and it was natural that she should have this in view, considering the

small proportion of unproductive property which she left and seeing that most of the lots now in controversy were owned by her as tenant in common with the appellant, and, if the evidence is admissible, which we shall consider later, that the appellant did not want to sell.

The testatrix had it in mind, we say, that part of her unproductive property might not be sold, and having it in mind she defined what the appellant was to have, by defining what she called net income. She gave the residue to trustees and empowered them to manage and improve " the whole of said estate," "and from the rents, profits and income from the said property" she directed them "to pay all taxes, expenses, charges and commissions of whatever name or nature, that shall be assessed upon or arise from or grow out of the, said Residuary Estate, or the management, care or disposition thereof, and the balance of said rents, profits and income shall be deemed to be the net income from the said estate; and I direct the said Trustees to pay the said net income" to the appellant. She gives her the actual income thus determined and defined, nothing more. This will was executed on September 1, 1863. It would not be an extravagant conjecture that the net income to be received by the appellant was defined thus carefully in view of the then very recent decision in *Kinmonth* v. *Brigham*, 5 Allen, 270, and to avoid any argument that might be drawn from that case. But the argument, if not already excluded, at least was much weakened by the difference of circumstances. *Kinmonth* v. *Brigham* dealt with an investment in a partnership which it was the duty of the trustees to get out of as soon as they could. Here we are considering an investment which the trustees were expressly authorized to keep if they thought it wise.

It is not necessary to say that the construction of the will disposes of every imaginable case in which the trustees should not go outside the authority given to them. But we certainly think that it leaves little more to be said upon the matter now under consideration. The cases warrant some regard being had to the administration of the fund as a whole, *New England Trust Co.* v. *Eaton*, 140 Mass. 532, 542, 543; *Hemenway* v. *Hemenway*, 134 Mass. 446, 452, 453, and that perhaps was the scheme of the will. At all events, in other cases income has profited at

the expense of capital. The appellant received the whole interest on $700,000 United States bonds inventoried at $728,000, and, when the bonds were called in in 1877, a loss of $10,500 was charged to capital. If the calculation of the trustees is right, and we did not hear it disputed, the appellant has received something like four and three quarters per cent net income a year on the whole property for the twenty-six years from 1872 to 1898; and meantime the capital has increased in value more than $175,000.

The foregoing argument gains in strength, and an independent one arises, if we are at liberty to consider the attitude of the appellant. As we have said, she was a tenant in common with the trustees of most of the land in controversy, and there is no doubt that she did not want to sell, if the evidence is admissible. The evidence is of two sorts, conversations with Mr. Crapo, one of the trustees, before he became such and while he was her counsel, and afterwards when he was trustee, and letters of Mr. Mandell, one of the trustees, now deceased, to the appellant and to her husband. The only important part of Mr. Crapo's testimony concerned the time when he was trustee, and therefore was admissible without help from other facts. Of course the appellant's communications with him while he was her counsel were privileged, but they were unimportant and it appeared that the privilege was waived in the Probate Court. Nevertheless the objection was urged when the case came to be tried before the justice of this court, and an exception was taken when he ruled that the privilege having been waived could not be insisted upon before him. We do not think it necessary to remark upon the willingness to hold back this testimony. We content ourselves with saying that the ruling was right. The privacy for the sake of which the privilege was created was gone by the appellant's own consent, and the privilege does not remain under such circumstances for the mere sake of giving the client an additional weapon to use or not at his choice. *McKinney* v. *Grand Street, Prospect Park and Flatbush Railroad,* 104 N. Y. 352.

Whether a different rule should obtain with regard to testimony tending to criminate the witness, as held in *Georgia Railroad & Banking Co.* v. *Lybrend,* 99 Ga. 421, 439, it is

unnecessary to decide.   Evidently somewhat different considerations apply.

The objection to Mr. Mandell's letters, or rather to his letter press copies, was that it did not appear that the documents copied ever had been sent.   They had been let in in the Probate Court, in the presence of the appellant and her counsel, without objection, and the justice of this court let them in, together with evidence of the appellant's testimony below that, as to those addressed to her, in part she did not receive them or did not remember having received them.   It hardly is necessary to spend much time on this question, as it is evident from what we have said that the appellant must fail whether the letters are in or out, and the justice's finding purports to have been made without regard to them.   It would not be much of an extension of *McKay* v. *Myers*, 168 Mass. 312, and St. 1898, c. 535, to let them in even without the appellant's partial admission.   The copying of letters into a business letter book, having reference to ordinary practice, imports a declaration that they are in the course of transmission, and when the copying was by a man now dead, it would not be a great strain to hold his implied declaration to be within the statute.   Or, as was argued for the trustees, the copying might be treated like an entry in the regular course of business.   See *Produce Exchange Trust Co.* v. *Bieberbach*, 176 Mass. 577, 587, and cases cited.   If the letters are shown to have been put in the regular channel for transmission, it might be inferred that they reached their destination.   *Swampscott Machine Co.* v. *Rice*, 159 Mass. 404.   Certainly we should not disturb the judge's finding because of this ruling.

It is urged that whatever the appellant may have done in her private interest as co-tenant did not diminish her rights by virtue of her equitable life estate in the other fraction of the land belonging to the trust, and that the trustees might have made partition or sold the undivided interest.   We shall not discriminate more nicely than the appellant ever dreamed of doing.   The sale of an undivided interest would have been absurd, and it is altogether probable that partition was as impracticable as it was undesired.   If the petitioner had wished to throw upon the trustees the responsibility of dealing with divided lands, and of seeing that she got her return from them apart from the increase

in value of her own portion, it was within her power to do it. She was as able to compel a division as the trustees, but she did not want it until after the event.

It was assumed by both sides that in the case of the Maine Central Railroad stock, sold at a great advance after having been kept about ten years without receiving any dividends, the same rule would be applied as that which should be held to govern the unproductive land. Nothing need be added with regard to it.

We have disposed of the exceptions and appeal of the life tenant. No one else appeared or excepted, and therefore no other questions are open.

*Exceptions overruled; decree affirmed.*