STEINBERG et al. v. COX et al.—144 S. W. (2d) 12.

Western Section. December 6, 1939.

Petition for Certiorari Denied by Supreme Court, March 2, 1940.

342

W. Curtis Pope, of Memphis, for appellants.

Julian C. Wilson, Bertrand W. Cohn, and Bartels & Bartels, all of Memphis, for appellees.

ANDERSON, J. This bill was filed by the widow and children of Arthur Clouston, who died on June 30, 1918, against W. M. Cox, former clerk and master of the Chancery Court of Shelby County, and the American Surety Company, the surety on his official bonds, and Marx & Bensdorf, Inc., seeking to recover the sum of $2,000 and interest from February, 1932.

The bill, as amended, in effect charges that the clerk and master, having in his hands $10,000 under an order of the court which required him to let certain funds out at interest and pay the interest over to Ida Steinberg during her life, and hold the principal for the minor remaindermen, invested $2,000 of it in what is termed "split mortgage bonds" issued by Marx & Bensdorf, Inc.; that the investment was unwarranted and illegal because, under applicable statutory provisions and restrictions the clerk and master had no right to invest the fund in anything but United States bonds and, moreover, was absolutely obligated in any event to pay over money received by him, which, to the extent mentioned, he had failed to do.

In addition to the contention that the investment made was illegal, it is charged that the clerk and master was negligent in making it, and a loss resulted.

The bill proceeds against the defendant Marx & Bensdorf, Inc., upon the theory that it knowingly participated in the diversion of the trust funds. It is also charged that Marx & Bensdorf, Inc., without an order of the court, caused the mortgage to be foreclosed, bought it in as trustee for the bondholders and, without authority from the court, caused a new mortgage to be placed on the property for $1,600 and incurred expenses for repairs amounting to $2,500, thereby subordinating the interest of the bondholders, including the clerk and master, to these expenditures. And it is charged that this conduct gave rise to liability on the part of Marx & Bensdorf, Inc. All parties defendant demurred to the bill as amended. The demurrer of Marx & Bensdorf, Inc., is grounded on repugnancy, in that, it is claimed that the bill sought to recover the original $2,000 on the allegation that the investment was a diversion of the trust fund, thereby disaffirming and repudiating the purchase of the bonds, and also seeks a recovery against Marx & Bansdorf for its dealings with the property purchased under the foreclosure proceedings, thus going upon an affirmance of the investment.

All demurrers were overruled with leave to rely on the same grounds in the answers. Answers were seasonably filed, in which the demurrers were again relied on. As to the defenses set up in the respective answers it is sufficient to say that all defendants deny that there was either illegality or negligence in the investment and, in addition, the defendant, Marx & Bensdorf, Inc., sets forth in detail its handling of the property and in effect denies that it had at any time or in any way dealt with the property in such a way as to make it liable in any amount to the complainants.

Prior to the hearing on the merits the demurrers were again called up and overruled. Thereupon, after a hearing on the pleadings and the evidence the chancellor dismissed the bill and complainants prayed a broad appeal. The case is before us for a hearing de novo.

There is no dispute about the facts upon which the determinative questions are to be decided. They are as follows: In an old case pending in the Chancery Court at Memphis styled Steinberg v. Clouston, a decree was entered providing in substance that Ida Steinberg owned a life estate in certain lands and that the other complainants, then minor defendants, owned the remainder interest; that said property had been sold under the order of the court for $10,000; and that the clerk and master should keep this fund intact "and let said funds out at interest and pay the interest over to Ida Steinberg during her life; the body of the funds to be held for the minor defendants." Thereafter on August 2, 1926, a decree was

entered in that case approving an investment of $2,000 of the funds, the order reciting, among other things, "that the Clerk and Master has been offered for purchase a note in the principal sum of Two Thousand Dollars ($2,000.00) . . . secured by a first mortgage on house and lot located at 1992 Court Avenue, city of Memphis, . . . And it further appearing to the Court that the above notes (the ones offered for purchase) secured by first mortgage on the Court Avenue property, are well secured and a good and safe investment, the Clerk is hereby ordered to purchase said notes . . ."

The investment was made as directed and matured on August 14, 1930, the proceeds being paid to the defendant, Cox, in his capacity as clerk. On September 30, 1930, Cox re-invested the $2,000 in two $1,000 bonds, referred to as "split mortgage bonds," issued through the bonding house of Marx & Bensdorf, Inc. These bonds were two of an aggregate of $9,000 secured by a first mortgage on real estate in the City of Memphis known as 701 Richmond Avenue and were executed by I. D. Block and wife and Leo Goodman and wife. The property securing the bonds was a lot fronting 81.3 feet on Richmond Avenue and being 185 feet deep, on which was located a four-apartment brick building with six rooms to each apartment, the rental derived at the time of the investment being $200 per month. These bonds were purchased without an order or the approval of the chancellor. No decree or order other than that above referred to relative to the investment of said fund was entered.

Interest on the investment at the rate of 6 per cent. provided by the bonds was paid to the clerk on September 5, 1931, August 4, 1931, and September 4, 1932, but no interest was paid thereafter. The bonds being in default, the property was sold under a foreclosure proceedings, being bought in under what is referred to as a bondholders' protective agreement by Marx & Bensdorf, Inc., as trustee.

The approval of the chancellor of the foreclosure proceeding was not sought or obtained.

Thereafter, at a meeting of the bondholders, at which the defendant Cox was not present or represented, the trustee, Marx & Bensdorf, was authorized to borrow money on the property to pay delinquent taxes and certain other expenses. This was done and with the proceeds of the loan, amounting to $1,600, the expenses incurred in obtaining it, the expenses of the foreclosure proceeding, an insurance premium and a mechanic's lien for a roof, were paid.

At the time the bill was filed the gross revenue from the property was $140 per month.

From the date of the foreclosure proceeding to April, 1938, the trustee collected $8,002.90 and expended $8,009.04 in handling the property, which included payment of the repair charges amounting to $2,227.02.

On or about December 21, 1938, before the trial, the trustee under the authority of the bondholders' protective agreement, sold the property for a total of $6,000 and after payment of the first mortgage indebtedness of $1,600 and taxes and costs there remained for distribution approximately $3,860, netting the bondholders about 43 cents on the dollar.

■ The first contention is that under statutory provisions the clerk and master was empowered to invest funds in his custody as clerk only in stocks or bonds of the United States government; and hence the investment made was illegal.

This view is based upon the assumption that the Acts of 1865, Chapter 19, was applicable to the disposition of the fund. This statute, as compiled in Shannon's Code, Secs. 5433 and 5434, reads as follows:

5433. "The courts of law and equity in this state are hereby authorized to have the money and funds in the hands of clerks and receivers, or trustees, in litigation or under the control of said courts, invested in the public stocks or bonds of the United States, under such rules and orders in each case as may be legal and just."

5434. "Guardians, executors, administrators, and trustees, shall also be authorized and empowered to invest money and funds in their hands in the public stocks or bonds of the United States, and make report thereof to the county court of the county where such guardian, executor, administrator, or trustee resides, unless another mode of investment is required by will or deed of the testator or other person who has established the fund."

The contention is that these statutory provisions "contain specific directions for the investment of funds in the hands of clerks and other fiduciaries, which specifically directs, deprived the defendant Clerk of any right to use his discretion in investing the funds in question; and that failing to follow the law, he is held to strict accountability."

In the case of Falls v. Carruthers, 20 Tenn. App., 681, 103 S. W. (2d), 605, we had under consideration this statute (and certain others not necessary to mention) in its relation to an investment by a testamentary trustee. While not basing the conclusion there reached altogether upon a construction of the provision here involved, speaking through Presiding Judge Senter, we did take occasion to say:

"We are inclined to the conclusion that these acts are not mandatory, but are intended to authorize by specific reference thereto the investment of the trust funds in certain property or securities listed or named, and therefore permissive rather than mandatory requirements.

"It is to be noted that in each of these acts it is said that the trustee 'is authorized' and 'may invest.' In neither of these acts

is it stated that the trustee 'must' so invest.'' Local citation, 20 Tenn. App., page 690, 103 S. W. (2d), 611.

The question is squarely presented in the instant case and upon a re-examination of it we are satisfied that the view indicated in the above quotation is correct. We find nothing in the language of the statute, nor the object sought to be accomplished, that would justify a contrary conclusion. Nor do we find any authority to support such a construction. Upon the other hand the phrase ''hereby authorized,'' in the absence of anything indicating the contrary, is to be taken as the equivalent of ''it shall be lawful,'' (Lewis' Sutherland Statutory Construction, pp. 1146, 1148, 1149, Sec. 636) and, as ordinarily understood, means that authority ·or power to do the thing contemplated is conferred rather than that it must be done.

■ It is further insisted that even if the above-mentioned statute is not mandatory, still the clerk was required to invest the funds in accordance with the provisions of Shannon's Code, sections 4280, 4281 and 4281a1.

Section 4281 contains section 2 of Chapter 19 of the Act of 1865, also compiled in section 5434 above referred to, and by its terms applies to ''guardians, executors, administrators, and trustees'' reporting to the county court. The idea that the clerk and master of the Chancery Court, being a trustee of funds in his hands, is covered by this statute is excluded by the classifying requirement that a report of the investments authorized is to be made to the County Court of the county where such guardian or trustee resides. The clerk and master of a Chancery Court is not in any sense under the supervision of the County Court.

Moreover, as we have held above, the language employed to the effect that those named shall be ''authorized and empowered to invest money and funds in their hands in the public stocks or bonds of the United States'' requires, in the absence of any other controlling consideration, that the statute be regarded as permissive rather than mandatory.

■ The other two sections, 4280 and 4281a1, so clearly relate solely to investments by guardians that their non-applicability to those by a clerk and master we think needs no elaboration.

■ It is next contended that by virtue of the statute carried into Shannon's Code, section 5860, the clerk and master was bound absolutely to pay the fund belonging to the complainants upon proper application.

This statute, as well as that compiled in Shannon's Code, section 5373, subsection (1), also relied upon, have no application to the situation giving rise to the question here presented. Otherwise the clerk of a court would be regarded as insuring the forthcoming of funds in his hands. That this is not the rule in Tennessee, we

think is settled by the authorities in this jurisdiction. Thus, in State et al. v. McLemore, 162 Tenn., 129, 37 S. W. (2d), 103, 104, the court had under consideration the nature and extent of the liability of a county court clerk for public funds. As to this it was held that in this State such an official is regarded as a "bailee or trustee of such funds, merely chargeable with requisite care in their protection." Although in that case the funds involved were public funds we think, upon reason, that the principle is no less applicable to funds in the hands of a clerk belonging to private individuals.

■■ In this state, the clerk and master of a Chancery Court, as well as a clerk of the County Court, is held to be a trustee of funds in his hands and his duties and responsibilities are those of such a fiduciary rather than those of an insurer. Marion Trust & Banking Co. v. Roberson, 151 Tenn., 108, 268 S. W., 118. And in the absence of a statute or restrictions in the instrument creating the trust, a trustee is held only to the exercise of good faith and due diligence in the investment of funds that he is authorized or required to invest. Young v. Phillips, 170 Tenn., 169, 93 S. W. (2d), 634, 104 A. L. R., 975. The Restatement of the Law of Trusts, Sec. 227.

In this respect the situation of such trustee, including clerks and masters, is different from that of guardians, whose authority in this connection is purely statutory and who are bound to invest the ward's funds as specified by legislative enactment. Humphries v. Manhattan Sav. Bank & Trust Co., 174 Tenn., 17, 122 S. W. (2d), 446.

■ It is needless, perhaps, to observe that if an order of the court specifies the nature of the investment to be made by its clerk, that order must be strictly followed and a failure to do so will render the latter liable for any resulting loss. State, etc., v. Fidelity & Dep. Co., 132 Tenn., 303, 178 S. W., 433. But, in the absence of such an order, there being no mandatory statute relating thereto, the nature and form of the investment lies in the discretion of the clerk and master, he being held to the standard of care above mentioned.

■ The complainants further insist that "the record discloses that the investment of the said trust funds was made without the approval of the Chancery Court of Shelby County, Tennessee, and in violation of the terms of the decree providing that the total fund of $10,000.00 shall be held intact."

If it is meant by this that the clerk was bound to invest all of the fund, that it could not be split up into separate investments, we think the orders of the court relative thereto are not susceptible of any such construction.

That the chancellor did not so intend is conclusively demonstrated by the fact that the decree of August 2, 1926, expressly authorized the investment of a portion of the fund, namely, $2,000 in a first mortgage note.

We are referred to the case of State, etc., v. Fidelity & Deposit Co., supra, to support the contention just mentioned. That case, we think, is not in point upon the facts. There it was held that a special commissioner, having in his hands certain monies arising out of the sale of real estate which he had been appointed to make was liable because he had been expressly directed to loan the fund on a note "with two good and solvent sureties . . . to be approved by the court" and instead of doing so he disregarded the order and loaned it with only one surety and without the approval of the court.

The clerk and master in the case before us disobeyed no order of the chancellor. As we have seen, he was instructed merely to invest the fund and in the absence of a specific direction either by statute or by the chancellor with respect to the nature of the investment, he was, as already indicated, charged with the duty of a trustee only, that is, to exercise reasonable diligence and good faith in the premises.

It is next insisted that this duty could not be performed by an investment in what is termed "split mortgages," the meaning of which has been sufficiently indicated above. The contention seems to be that the making of such an investment is negligence per se; that is, that it is ipso facto unauthorized in that no prudent person would make it.

Contrary to the complainant's contention, the case of Freeman v. Citizens' Nat. Bank, 167 Tenn., 399, 70 S. W. (2d), 25, is not authority for this view. That case ruled that a guardian had no authority to invest the funds of his ward in an existing mortgage. The conclusion was required by the fact that a guardian's authority in this respect is purely statutory. See Humphries v. Manhattan Savings Bank & Trust Co., 174 Tenn., 17, 122 S. W. (2d), 446.

In the same connection we are referred to the English case of Webb v. Jones [1888], L. R., 39 Ch. Div., 660, the holding in which is set forth in the annotation appearing in 103 A. L. R., 1192, et seq., dealing with the "investment of trust funds in share or part or single security or group or pool of securities."

The annotation demonstrates that the authorities are conflicting upon this question. We think the better rule is that in the absence of express direction by statute, by court order or instrument creating the trust, a trustee, so long as he acts prudently and in good faith, may invest the trust fund in "split mortgages," such as are herein contemplated without ipso facto incurring liability for any loss which might follow. The cases may be found in the above-mentioned note. See Restatement of Law of Trusts, Sec. 227.

This brings us to the question of whether, under the facts of the present case, the investment in question was one that a prudent man under the same circumstances would have made of his own property. Restatement of the Law of Trusts, Sec. 227.

Marx & Bensdorf, Inc., is a long-established house of good reputation, engaged in the business of making mortgage loans and dealing in real estate and insurance. It made the loan of $9,000 to Messrs. I. D. Block and Leo Goodman, both of whom bore good reputations as business men and at that time there was no reason to question the solvency of either. The loan was evidenced by a total of six bonds, three of $1,000 each and three of $2,000 each.

The transaction was handled by Mr. Haase who had been connected with the house of Marx & Bensdorf since 1891. He is shown to have had a very extensive and successful experience in matters of this kind. He personally appraised the property at $16,000 upon a personal examination thereof. As before stated it had a rental value of $200 per month.

At the time the loan was made there was a balance of $8,473 due on an original first mortgage which had been executed through the banking house of Crump & Trezevant in the amount of $12,500 and there was a second mortgage in the sum of $2,500.

It is shown by the undisputed evidence that at the time this loan was made the economic depression had not appreciably affected the real estate and investment business and real estate values in the City of Memphis. It is also shown that Marx & Bensdorf, Inc., had been highly successful in connection with loans financed by them. They numbered among their clients and patrons various financial institutions of Memphis and people occupying fiduciary relations. Securities issued through their house were purchased on the advice of the judge of the Probate Court of Shelby County. In addition it is shown that the chancellors then presiding over the Chancery Court of that county from time to time invested in mortgage bonds issued through that house.

It is also shown that it was not unusual for investors of the class mentioned to purchase a part of a mortgage loan or a part of a group of securities covered by one mortgage. Such investments were very common.

In the instant case the clerk was represented in making the investment by his deputy, Mr. Pierini. While he did not examine the property personally the latter was fully informed of the facts of the appraisal.

Mr. Pierini testified that there was no reason at the time to doubt the solvency of the makers of the notes or to question the sufficiency of the security; that at this particular time first mortgage bonds issued through Marx & Bensdorf, Inc., were considered sound investments, there being a demand for the bonds and a "waiting list;" that at that time bonds of this character were being bought generally by executors, trustees, banks and trust companies having funds belonging to fiduciaries. The facts so testified to are not controverted.

The defendant Cox learned of the investment made by his deputy immediately and regarded it as a sound one. He had previously, in his individual capacity, purchased the same character of first mortgage bonds from Marx & Bensdorf and had never, prior to August, 1930, suffered a default with respect to any of them. Cox testified that there had been no default on such bonds prior to August, 1930, that had been bought in his official capacity as clerk.

The complainants learned of the purchase of the investment and the character thereof shortly after it was made and made no objection of any kind thereto. In fact, Milton Steinberg, the husband of the complainant Ida Steinberg, is shown to have acted as the agent for his wife in connection with the fund in the custody of the court and it appears that while in the office of the clerk for the purpose of collecting the interest on one of the prior loans, upon observing Pierni clipping some coupons from Marx '& Bensdorf bonds, he remarked to the latter that he would like to have a loan of that kind, whereupon Pierni told him that when his loan was paid (referring to a loan of the funds here involved) he would get one of that character for him.

It is shown by stipulation that on August 4, 1923, the banking house of Crump & Trezevant, acting through Harry Martin, appraised the property in question for a loan to be made to Max Less, fixing the value as of that date at $24,355. On May 2, 1923, Crump & Trezevant made two loans to Max Less, both secured by mortgages on this property, the first being for $12,500 and the second for $3,500. The first was paid in full, a balance of seven or eight thousand dollars being paid out of the proceeds of the particular loan here involved.

Incidentally, it is shown that Mr. Martin, who made the appraisal for Crump & Trezevant, is at the present time the vice-president and general manager of the Metropolitan Life Insurance Company's St. Louis representative.

 The complainants insist that the fact that the loss resulted from the investment is proof that the clerk did not exercise the required degree of care in making it. This is to ask us to apply a rule of "hindsight" rather than "foresight." We decline to do this; for there could hardly be a more unjust criterion. It would fix a standard that no man should be judged by. As was aptly observed by Mr. Justice Brewer in United States v. American Bell Tel. Co., 167 U. S., 224, 261, 17 S. Ct., 809, 818, 42 L. Ed., 144, "A wisdom born after the event is the cheapest of all wisdom. Anybody could have discovered America after 1492."

 It is to be borne in mind that, as above pointed out, trustees of the class to which a clerk and master belongs are not insurers but, under the general rule, are held only to the exercise of good faith and due diligence. Lee v. First Nat. Bank, 150 Tenn., 275, 263 S. W.,

89; Marion Trust & Banking Co. v. Roberson, supra. It will not do to say that trustees are wanting in sound discretion with respect to an investment "simply because their judgment turned out wrong." Green v. Crapo, 181 Mass., 55, 62 N. E., 956, cited by our Court in Young v. Phillips, 170 Tenn., 169, 175, 93 S. W. (2d), 634, 636, 104 A. L. R., 975.

Paraphrasing a sentence appearing in the last-mentioned case and applying it here, "the facts must be considered as they presented themselves at the time" the clerk and master acted, "and not from the illumined viewpoint of subsequent events."

The loss in the present case was not due to the fact that an investment was made in a so-called "split mortgage" but to the fact that shortly thereafter the country was beset with an economic depression of unprecedented proportions. To say that a prudent man should have foreseen the magnitude and far-reaching effects of that disaster would be to convict a vast majority of the most careful business men in the nation of negligence. Such a conclusion would be unreasonable when judged by any permissible standard. Cf: Young v. Phillips, supra.

We concur in the conclusion of the chancellor that the defendant Cox was not guilty of any negligence in the premises and that there is no basis for holding him liable for the loss sustained.

In view of this conclusion it necessarily follows that the defendant Marx and Bensdorf, Inc., could not be liable upon the theory that in selling the notes it participated in a diversion of the trust fund.

The remaining contention is that the manner in which the property was handled and dealt with by the defendant, Marx & Bensdorf, Inc., after it was bought in for the bondholders at the foreclosure proceedings gave rise to liability on the part of that defendant. The theory upon which this contention proceeds is that in foreclosing the mortgage and in expending approximately $2,500 for repairs on the property without approval of the Chancery Court that defendant was guilty of "a wrongful conversion or diversion of said trust funds" which made it "individually liable to complainants for loss of principal and interest."

It is insisted that the chancellor should have held that because of this unauthorized action "the investment was changed from a subordinate interest in a first mortgage to an interest wholly subordinate to a first mortgage and liens for repairs and was made in violation of statutory laws pertaining to the investment of trust funds and made Marx & Bensdorf, Inc., a trustee, ex delicto for said funds."

We are cited to no authority to support this view and think there is none. When the bonds were in default the bondholders, including the defendant Cox, clerk and master, signed a security holders' protective agreement which authorized Marx & Bensdorf, Inc., to

352

purchase the property under foreclosure for the benefit of all the bondholders alike, and this it did. The agreement conferred upon Marx & Bensdorf, Inc., the right to handle the property in every way, including selling and mortgaging. Thereafter the bondholders, except Cox, not desiring to advance the money themselves for these purposes, authorized Marx & Bensdorf, Inc., to borrow $1,600 on a mortgage on the property, the proceeds to be used to pay liens prior to the mortgage, necessary insurance premiums and expenses of foreclosure and the like, and the funds were in fact so used.

We are unable to perceive how this action impaired or displaced the security of the bondholders or resulted in any loss to the complainants. We discover no conduct on the part of Marx & Bensdorf, Inc., that would make it liable by reason of the manner in which it dealt with the property. Upon the other hand, so far as appears, it acted throughout in the utmost good faith and with due diligence —no different from the manner in which a prudent person would have acted in dealing with his own property.

The defendant Marx & Bensdorf, Inc., has assigned error on the action of the chancellor in overruling its demurrer to the bill on the theory of repugnancy. Contrary to the complainants' insistence, it was permissible for this defendant to assign error on rulings adverse to it, although it did not appeal, in view of the fact that the appeal by the complainants was a broad one. Central Nat. Bank v. Willis, 8 Tenn. App., 204, and cases cited.

However, we overrule this assignment of error on the ground that, in view of the conclusions we have reached, as above indicated, on other phases of the case, it has become immaterial, rather than on the ground that it is without merit.

The result is that the decree of the chancellor is affirmed at the cost of the complainants.

Senter and Ketchum, JJ., concur.