The PERMIAN CORPORATION and Occidental Petroleum Corporation,

v.

UNITED STATES of America, Appellant.

No. 80–1817.

United States Court of Appeals, District of Columbia Circuit.

Argued May 11, 1981.

Decided Sept. 9, 1981.

Howard S. Scher, Atty. Dept. of Justice, Washington, D. C., with whom Alice Daniel, Asst. Atty. Gen., Charles F. C. Ruff, U. S. Atty., Anthony J. Steinmeyer, Atty., Dept. of Justice, and Paul G. Wallach, Atty., Dept. of Energy, Washington, D. C., were on the brief for appellant. Frederic D. Cohen, Atty., Dept. of Justice, Washington, D. C., also entered an appearance for appellant.

Robert E. Juceam, New York City, with whom Harvey L. Pitt, Gregory Joseph, Daniel Shapiro, Washington, D. C., was on the brief, for appellees, The Permian Corporation, et al.

Daniel J. Popeo, Paul D. Kamenar, Washington, D. C., and Daniel Bensing were on the brief for amicus curiae, Washington Legal Foundation, urging affirmance.

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

Linda D. Fienberg, Atty., Securities and Exchange Commission, Washington, D. C., entered an appearance for appellee, Securities and Exchange Commission.

Before McGOWAN and MIKVA, Circuit Judges, and JAMESON,* Senior United States District Judge for the District of Montana.

Opinion filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge:

This is an appeal from a permanent injunction barring the Securities and Exchange Commission ("SEC") from providing the United States Department of Energy with access to certain documents obtained from Occidental Petroleum Corporation and its subsidiary The Permian Corporation (denominated collectively as "Occidental"). The district court found that these documents were subject to the attorney-client and work product privileges, and that Occidental's arrangements for delivery of these documents to the SEC did not constitute a waiver of the privileges.

We conclude that the district court's finding of an agreement to preserve the work product privilege was not clearly erroneous. We also find, however, that Occidental waived the attorney-client privilege as to the documents by voluntarily disclosing them to the SEC. Accordingly, we affirm the district court's judgment in part, and we reverse and remand in part.

## I. THE FACTUAL CONTEXT

Most of the facts are undisputed. In 1978, Occidental proposed an exchange offer for shares of the Mead Corporation ("Mead"). *See Permian Corp. v. United States*, Civ. No. 79–2098, mem. op. at 2 (D.D.C. May 15, 1980) [hereinafter cited as *Mem. Op.*]. Mead's management opposed the proposal, and initiated litigation in various courts. *Id.* at 3–4. Occidental produced millions of documents in response to Mead discovery requests, but sought to preserve claims of privilege and confidentiali-

ty, at first by painstaking screening and later with the additional protection of a stipulation between Occidental and Mead providing that inadvertent production of a privileged document would not constitute a waiver of the privilege. Shortly thereafter, an order was entered in one of the federal district courts where the takeover litigation was proceeding, requiring both Mead and Occidental to give each other forty-eight hours notice before submitting any potentially confidential document of the opponent to a state or federal regulatory agency, and requiring court permission for the submission if the opponent objected. *Id.* at 5.[1]

Meanwhile, Occidental was involved with the SEC, which was inquiring into the adequacy of Occidental's registration statement for the proposed exchange offer. Occidental was understandably concerned that the SEC approve the registration statement and permit it to become effective as soon as possible, so that the offer could be made. *See* 15 U.S.C. §§ 77e, 77h (1976). The SEC began an informal investigation of certain factual issues, including problems raised by counsel for Mead. *Mem.Op.* at 7–8.

Occidental made available to the SEC some 1.2 million pages of documents. The sheer bulk of this response impaired its usefulness to the SEC, and SEC staff requested Occidental's permission "to secure the confidential Occidental information directly from Mead which had organized them around its adversarial issues and claims." *Id.* at 8. The SEC made it clear that processing of the registration state-

ment would be greatly facilitated by access to Occidental documents presifted by Mead; without that access, considerable delay could result. The district court found that "[t]o avoid such delay Occidental's counsel negotiated with the SEC staff and Mead a procedure whereby the Commission would obtain confidential documents directly and expeditiously from Mead." *Id.* at 9.

The nature of the resulting agreement was disputed in the district court. The record includes four letters from Occidental's counsel, three addressed to SEC staff and one addressed to counsel for Mead.[2] The first two letters set forth a scheme for special handling of Occidental documents. Mead was permitted to deliver documents it had received in discovery to the SEC, but Mead was to inform Occidental within forty-eight hours of the identity of any documents delivered. All documents were to be stamped with a restrictive endorsement warning against disclosure by the SEC.[3] The SEC agreed not to

deliver any of the Documents to any person other than a member of the Commission or the Staff or any other government agencies, offices or bodies or to the Congress for a reasonable period of time after notice to Occidental of the Staff's intention to deliver the Documents to such person.

Letter of Sept. 22, 1978, J.A. 168–69; *see* Letter of October 17, 1978, J.A. 140–43; *Mem.Op.* at 9.

The other two letters, both from December 1978, suggest a less protective attitude towards the confidentiality of the docu-

---

1. *See Mead Corp. v. Occidental Petroleum Corp.*, Civ. Nos. C–3–78–241 & C–3–78–242, Stipulation and Order (S.D.Ohio Sept. 14, 1978), Joint Appendix ("J.A.") at 108–13. A similar protective order was entered in an administrative proceeding before the Division of Securities of the State of Ohio Department of Commerce. *Mem.Op.* at 5.

2. *See* J.A. 168 (letter of Sept. 22, 1978 from Occidental counsel to SEC staff); J.A. 140 (letter of Oct. 17, 1978 from Occidental counsel to Mead counsel); J.A. 176 (letter of Dec. 5, 1978 from Occidental counsel to SEC staff); J.A. 19 (letter of Dec. 22, 1978 from Occidental counsel to SEC staff).

3. The stamps read:

 This Document constitutes a Trade Secret and/or Commercial or Financial Information which is Privileged and Confidential and may not be Released or Disclosed.

 Pursuant to procedures adopted by Occidental & the Securities & Exchange Commission, this Document may not be disclosed by the Commission to any third-party unless prior notice of such proposed disclosure has been given to Occidental.

 *Mem.Op.* at 9.

ments. The district court found, however, that these letters formed part of a negotiation between Occidental and the SEC for a new arrangement that was never completed, and that they did not supersede the earlier agreement. *Mem.Op.* at 10.

The letters evidencing Occidental's understandings with Mead and the SEC do not explicitly state that the SEC was forbidden to release confidential Occidental information to other government agencies. Counsel for Occidental stated, however, in an affidavit submitted to the district court, that "there was an oral understanding that Occidental would be advised as to governmental requests notwithstanding the letter," and that the terms of Occidental's agreement with the SEC "included [his] preclearance of the language of the stamped legends with the SEC staff." Reply Affidavit of Robert E. Juceam, ¶¶ 15, 20, J.A. 152, 154. Occidental argued that this scheme was designed to permit assertion of claims of privilege whenever the SEC attempted to disclose Occidental data received from Mead to any third party. The district court found, "[f]rom all that has been submitted by the parties, including affidavits and declarations, ... that this arrangement was an essential element of the discussions between the SEC staff and Occidental." *Mem.Op.* at 9.

Mead submitted "somewhat fewer than 1,000 documents" to the SEC between October and December, 1978, when Occidental abandoned its proposed exchange offer. *Id.* at 10. Among these were the thirty-six documents at issue in the present case, all written by Permian Corporation employees or Permian's outside counsel. Most of them relate to the legality of Permian's pricing practices for crude oil. *Id.* at 11–13. The district court concluded that seven of these documents were protected in whole or in part by the attorney-client privilege, and that the other twenty-nine were privileged

as attorney work product. The United States does not challenge the privileged character of the documents on appeal; it argues only that the privileges in question had been waived.[4]

It appears that the thirty-six documents were all in the SEC's hands by December 8, 1978, and that Occidental was informed of this fact by December 11. Reply Affidavit of Robert E. Juceam, ¶ 30 n.*, J.A. 165; *cf. Mem.Op.* at 17. In January 1979, the Department of Energy sought the documents from the SEC for use in an investigation of Permian's compliance with petroleum pricing regulations. Occidental promptly objected, and when the SEC reaffirmed its determination to release the documents to the Department of Energy in August 1979, Occidental commenced the present action. *Mem.Op.* at 11.

## II. DISCUSSION

We turn first to the twenty-nine documents that the district court found to be attorney work product. Appellants' only argument concerning these documents is that the district court's finding that Occidental had not waived the work product privilege was clearly erroneous. Appellants insist that the evidence demonstrates "that Occidental, although it may have preserved its privilege claims vis-a-vis non-governmental entities, clearly and intentionally waived its privilege claims vis-a-vis government agencies." Brief for Appellants United States and Department of Energy at 15–16.

The documentary evidence available concerning Occidental's arrangements with the SEC is ambiguous. Occidental's September 22 letter to the SEC could be construed to permit release of Occidental data to other government agencies without notification to Occidental,[5] and that letter is cited in the

---

**4.** Brief for Appellants United States and Department of Energy at 15 & n.13. Nor do appellants challenge the appropriateness of injunctive relief if the privileges have not been waived. *Id.*

**5.** The letter reads in part:

The [SEC] Staff will not deliver any of the Documents to any person other than a member of the Commission or the Staff or any other government agencies, offices or bodies or to the Congress for a reasonable period of

October 17 letter authorizing Mead to supply documents to the SEC.[6] On the other hand, the October 17 letter also speaks more generally of stamps "in accordance with terms and conditions arranged between the [SEC] and Occidental,"[7] and the stamped legends refer broadly to disclosure by the SEC "to any third-party," *see* note 3 *supra.* These letters are not inconsistent with the existence of an oral agreement between Occidental and the SEC, worked out in October, by which the SEC agreed to limit confidential documents submitted by Mead to its own use, and to afford Occidental an opportunity to raise claims of privilege before disclosure to all third parties. Occidental's counsel asserted that such an agreement existed, *see* Reply Affidavit of Robert E. Juceam, ¶ 15, J.A. 151–52, and the district court so found, *see Mem.Op.* at 9.

Appellants rely heavily on certain passages in Occidental's December letters to the SEC, but the district court found that these letters were part of a process of negotiation intended to lead to a modified agreement between the SEC and Occidental, a process that was never completed. Meanwhile, the court found "the former agreement of October, 1978 remained in effect." *Id.* at 10. Again, the December letters are not inconsistent with this interpretation.

 Appellants reject the district court's factual findings and ask this court to overturn them. By Fed.R.Civ.P. 52(a), this would require a conclusion that the district court's findings are "clearly erroneous." Under that rule,

the findings are presumptively correct and the burden of persuading us that they are "clearly erroneous" rests upon [the appellant]. Equally certain it is that we are not to weigh the evidence de novo, or disturb the findings simply because we might have reached a contrary result on the same evidence. And not only must we give "due regard . . . to the opportunity of the trial court to judge of the credibility of witnesses," but we must also measure the findings by the "clearly erroneous" test even when they are based on inferences drawn from documents or undisputed facts.

*Case v. Morrisette,* 475 F.2d 1300, 1307 (D.C. Cir.1973) (footnotes omitted). We cannot say that appellants have met their burden in this case. The district court's reading of the December letters as groping for a new arrangement rather than restating existing understandings reflects a reasonable interpretation of their language in the factual context. The crucial October 17 letter is not inconsistent with Mr. Juceam's representations to the district court that there were further oral arrangements between himself and SEC staff. The SEC affidavits contradicting Mr. Juceam's account raise issues of credibility, and we are unable to say for certain that the district court resolved them erroneously. When the appellate court is not " 'left with the definite and firm conviction that a mistake has been committed,' " it will not disturb the district court's finding of fact. *Id.* at 1307–08 (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948)).[8]

time after notice to Occidental of the Staff's intention to deliver the Documents to such person.
J.A. 169.

6. The letter reads in part:
4. In connection with each delivery of any Occidental documents by Mead to the Securities and Exchange Commission the transmittal letter or memorandum shall expressly set forth that Occidental's documents delivered with such letter or memorandum are being delivered on behalf of Occidental and in accordance with the terms and provisions of the letter agreement of September 22, 1978 between Occidental and the Securities and

Exchange Commission relating to procedures for the production of Occidental documents to the Securities and Exchange Commission in connection with Occidental's proposed exchange offer to shareholders of Mead.
J.A. 141–42.

7. *Id.* at 141.

8. We cannot conceal, however, our concern as to the professional propriety of Mr. Juceam's performance in the district court in the dual role of affiant and advocate. ABA Code of Professional Responsibility DR 5–101(B), 5–102 (1977). *See* Garvey, *The Attorney's Affidavit in Litigation Proceedings,* 31 Stan.L.Rev. 191,

Our conclusion that the district court's finding of an agreement was not clearly erroneous applies not only to the work product privilege, but also to the attorney-client privilege. Nothing in the evidence suggests that the SEC or Occidental intended to treat these privileges differently. This finding, however, is not dispositive of the claim that Occidental's attorney-client privilege has been waived, because the *legal* significance of Occidental's arrangements for the question of waiver depends on the nature of the privilege asserted. This court has recently had occasion to contrast the strict standard of waiver in the attorney-client privilege context with the more liberal standard applicable to the work product privilege:

> The attorney-client privilege exists to protect confidential communications, to assure the client that any statements he makes in seeking legal advice will be kept strictly confidential between him and his attorney; in effect, to protect the attorney-client relationship. Any voluntary disclosure by the holder of such a privilege is inconsistent with the confidential relationship and thus waives the privilege.
>
> By contrast, the work product privilege does not exist to protect a confidential relationship, but rather to promote the adversary system by safeguarding the fruits of an attorney's trial preparations from the discovery attempts of the opponent. . . . A disclosure made in the pursuit of such trial preparation, and not inconsistent with maintaining secrecy against opponents, should be allowed without waiver of the privilege. We conclude, then, that while the mere showing of a voluntary disclosure to a third person will generally suffice to show waiver of the attorney-client privilege, it should not suffice in itself for waiver of the work product privilege.

*United States v. AT&T*, 642 F.2d 1285, 1299 (D.C.Cir.1980) (emphasis and footnotes omitted).[9] *See generally* 8 J. Wigmore, Evidence §§ 2327–28 (McNaughton rev. 1961); McCormick on Evidence § 93 (Cleary ed. 1972).

■ In the present case, Occidental has destroyed the confidential status of the seven attorney-client communications by permitting their disclosure to the SEC staff. Whatever the truth may be concerning Occidental's arrangement to prevent release or disclosure of these documents to third parties by the SEC, there is no evidence in the record suggesting attempts to prevent their use by the SEC staff in the processing of Occidental's registration statement.[10]

---

193–94, 214 (1979) ("The more directly counsel speaks to disputed issues close to the merits of the case, the more significant will be the questions of his credibility and effectiveness as a witness and the impression carried off by the public of the role and character of the profession."). Our concerns also extend to his appearance in oral argument before this court. *Cf.* ABA Comm. on Ethics and Professional Responsibility, Informal Opinions, No. 1446 (1980) ("Ability of Lawyer Who Testified on Behalf of Client in Trial Court Where Client Was Represented by Other Counsel to Handle Matter for Client on Appeal"). Nonetheless, appellants do not appear to regard themselves as prejudiced by Mr. Juceam's conduct, and do not argue that it presents a basis for disturbing the credibility findings of the district court.

9. We do not address the applicability of the waiver doctrine for work product as set out in *United States v. AT&T* to the facts of the present case, since appellants have never raised the issue; in the context of work product, they have relied solely on the contention that the district court's findings of fact are erroneous.

10. Although the district court found that the December letters from Occidental counsel to the SEC were negotiations for a new understanding rather than descriptions of the existing understanding, it is noteworthy that they contain explicit statements that Occidental was not opposed to use of confidential documents by the SEC. *E.g.*:

> As you know, Occidental desires the expeditious conclusion of the Commission's investigation and wishes to allay any staff concerns that, because of the expedited proceedings, the Commission may not be able to utilize the documents the Company has furnished or, in the future, will furnish for legitimate law enforcement objectives. Simultaneously, Occidental seeks only to preserve the confidentiality of these documents with respect to their possible use by non-governmental parties.

Letter of December 19, 1978, J.A. 19–20. When this letter was written, Occidental coun-

Even after Occidental was specifically informed by Mead that the privileged documents had been submitted, Occidental did not request that they be returned unread. Occidental's eventual objections concerned only disclosure of the documents to the Department of Energy. *See* Reply Affidavit of Robert E. Juceam, ¶¶ 31–33, J.A. 165–66; Affidavit of Robert E. Juceam, ¶¶ 24–26, J.A. 62–63; *Mem. Op.* at 10–11. Under these circumstances "it is clear that the mantle of confidentiality which once protected the documents has been so irretrievably breached that an effective waiver of the privilege has been accomplished," *In re Grand Jury Investigation of Ocean Transportation*, 604 F.2d 672, 675 (D.C.Cir.), *cert. denied*, 444 U.S. 915, 100 S.Ct. 229, 62 L.Ed.2d 169 (1979).[11]

Occidental asks this court to create an exception to the traditional standard for waiver by adopting the "limited waiver" theory of *Diversified Industries, Inc. v. Meredith*, 572 F.2d 596 (8th Cir. 1977) (en banc). In that case, the Eighth Circuit stated:

> We finally address the issue of whether Diversified waived its attorney-client privilege with respect to the privileged material by voluntarily surrendering it to the SEC pursuant to an agency subpoena. As Diversified disclosed these documents in a separate and nonpublic SEC investigation, we conclude that only a limited waiver of the privilege occurred.... To hold otherwise may have the effect of thwarting the developing procedure of corporations to employ independent outside counsel to investigate and advise them in order to protect stockholders, potential stockholders and customers.

*Id.* at 611 (citations omitted). The Fourth Circuit has declined to apply *Diversified Industries* to grand jury proceedings following an SEC investigation, *In re Weiss*, 596 F.2d 1185 (4th Cir. 1979), and we find the "limited waiver" theory wholly unpersuasive.

█ First, we cannot see how the availability of a "limited waiver" would serve the interests underlying the common law privilege for confidential communications between attorney and client. As the Supreme Court has recently reiterated, "[t]he privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer being fully informed by the client"; the attorney's " 'assistance can only be safely and readily availed of when free from the consequences or the apprehension of disclosure.' " *Upjohn Co. v. United States*, 449 U.S. 383, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981) (quoting *Hunt v. Blackburn*, 128 U.S. 464, 470, 9 S.Ct. 125, 127, 32 L.Ed. 488 (1888)).[12] The privilege depends on the assumption that full and frank communication will be fostered by the assurance of confidentiality, and the justification for granting the privilege "ceases when the client does not appear to have been desirous of secrecy." 8 J. Wigmore, Evidence § 2311, at 599 (McNaughton rev. 1961). The Eighth Circuit's "limited waiver" rule has little to do with this confidential link

sel was fully aware that the documents at issue in this case had been submitted to the SEC by Mead. *See also* Letter of December 5, 1978, J.A. 177 ("we are not objecting to making this information available to the Commission for whatever law enforcement purposes it may ultimately deem appropriate").

**11.** Occidental's disclosures through Mead to the SEC were not inadvertent within the meaning of the doctrine recognized by some courts that preserves privilege claims when inadvertent disclosure is made despite diligent precautions in massive expedited discovery. *See, e.g., Transamerica Computer Co. v. IBM*, 573 F.2d 646 (9th Cir. 1978); *cf. In re Grand Jury Investigation of Ocean Transportation*, 604 F.2d at

675 (dictum). Occidental's initial delivery of these documents to Mead may have been inadvertent, but Occidental did not thereafter take necessary steps to preserve privilege claims as against the SEC before Mead's delivery of the documents. Nor did Occidental act to assert a privilege against the SEC when notified of the identity of the Mead submissions, though less than 1000 documents were involved.

**12.** The Court was careful in *Upjohn* to point out that the communications at issue "were considered 'highly confidential' when made, ... and have been kept confidential." 101 S.Ct. at 685 & n.5.

between the client and his legal advisor.[13] Voluntary cooperation with government investigations may be a laudable activity, but it is hard to understand how such conduct improves the attorney-client relationship. If the client feels the need to keep his communications with his attorney confidential, he is free to do so under the traditional rule by consistently asserting the privilege, even when the discovery request comes from a "friendly" agency.

Because the attorney-client privilege inhibits the truth-finding process, it has been narrowly construed, *see In re Grand Jury Investigation of Ocean Transportation*, 604 F.2d at 675; 8 J. Wigmore, Evidence § 2291, at 554 (McNaughton rev. 1961), and courts have been vigilant to prevent litigants from converting the privilege into a tool for selective disclosure. *See id.* § 2327; *United States v. Woodall*, 438 F.2d 1317 (5th Cir. 1970) (en banc), *cert. denied*, 403 U.S. 933, 91 S.Ct. 2262, 29 L.Ed.2d 712 (1971); *In re Penn Central Commercial Paper Litigation*, 61 F.R.D. 453, 464 (S.D.N.Y. 1973); *Green v. Crapo*, 181 Mass. 55, 62 N.E. 956, 959 (1902) (Holmes, J.) ("the privacy for the sake of which the privilege was created was gone by the appellant's own consent, and the privilege does not remain in such circumstances for the mere sake of giving the client an additional weapon to use or not at his choice"). The client cannot be permitted to pick and choose among his opponents, waiving the privilege for some and resurrecting the claim of confidentiality to obstruct others, or to invoke the privilege as to communications whose confidentiality he has already compromised for his

own benefit. *See, e.g., In re Natta*, 48 F.R.D. 319 (D.Del.1969); *United States v. Shibley*, 112 F.Supp. 734, 742 (S.D.Cal.1953). In the present case, Occidental has been willing to sacrifice confidentiality in order to expedite approval of the exchange offer, and now asserts that the secrecy of the attorney-client relationship precludes disclosure of the same documents in other administrative litigation.[14] The attorney-client privilege is not designed for such tactical employment.

Finally, we reject the argument that some public policy imperative inherent in the SEC's regulatory program requires that the traditional waiver doctrine be overridden. Occidental insists that this court should respect the attempts that Occidental and the SEC made to "accommodate[ ] each other's interest—a mutual interest—in the integrity of the Commission's investigatory and registration processes." Brief for Appellees at 37. Important though the SEC's mission may be, we are aware of no congressional directive or judicially-recognized priority system that places a higher value on cooperation with the SEC than on cooperation with other regulatory agencies, including the Department of Energy. At least one district court has viewed the "limited waiver" doctrine as extending beyond SEC inquiries to Internal Revenue Service and grand jury investigations, *see In re Grand Jury Subpoena Dated July 13, 1979*, 478 F.Supp. 368 (E.D.Wis.1979); we agree that the doctrine's rationale would dictate a wide scope of application for the "limited waiver." It is apparent that such a doctrine would enable litigants to pick and

13. Unlike the Eighth Circuit, we cannot see how "the developing procedure of corporations to employ independent outside counsel to investigate and advise them" would be thwarted by telling a corporation that it cannot disclose the resulting reports to the SEC if it wishes to maintain their confidentiality.

14. It is true that Occidental's waiver of the privilege with respect to the SEC is implied from its conduct, not express, but both forms are equally binding. *In re Grand Jury Investigation of Ocean Transportation*, 604 F.2d at 675. We cannot agree with the district court's hint that "Occidental's decision to allow Mead

to supply the documents to the SEC [was] less than wholly voluntary" because the SEC had indicated it would expedite processing of the registration statement, *Mem.Op.* at 16. If Occidental's massive and amorphous response to the SEC's information requests necessitated lengthy review (and Occidental has not alleged insincerity or bad faith in the SEC's negotiation), then Occidental's acquiescence can only be attributed to its own preference for swifter approval of the registration statement at the risk of disclosure of confidential communications.

choose among regulatory agencies in disclosing and withholding communications of tarnished confidentiality for their own purposes. We believe that the attorney-client privilege should be available only at the traditional price: a litigant who wishes to assert confidentiality must maintain genuine confidentiality.

■ We therefore conclude that Occidental has waived any protection that the attorney-client privilege might once have afforded to any of the thirty-six documents in question. Regardless of Occidental's intent to preserve the privilege as against its adversary the Department of Energy, Occidental's disclosure of these documents to the SEC was incompatible with the continued survival of the privilege.

### III. CONCLUSION

■ The district court found that twenty-nine of the thirty-six documents were subject to the work product privilege, and that this privilege had not been waived. The record does not compel such a conclusion, but the finding is not clearly erroneous and must be affirmed. The district court made no findings, however, concerning the privileged status of the other seven documents, except its finding that they were shielded by the attorney-client privilege which we hold Occidental has waived by its voluntary disclosure to the SEC. We therefore affirm the district court's judgment barring release of the twenty-nine work product documents, and remand for further consideration of the remaining seven documents in proceedings not inconsistent with this opinion.

*It is so ordered.*