Julia Eleanor Boland and Joseph M. Boland, Plaintiffs-Respondents, v. Mercantile-Commerce Bank & Trust Company and John L. Boland, Trustees Under Deed of Trust of Catharine M. Boland, and John L. Boland and Mercantile-Commerce Bank & Trust Company, Defendants-Appellants, Katharine T. Clemens, Defendant.—163 S. W. (2d) 597.

Division One, June 3, 1942.

Rehearing Denied, July 1, 1942.

*Thompson, Mitchell, Thompson & Young, Samuel A. Mitchell* and *Richard D. Shewmaker* for appellants; *Herbert W. Ziercher* for appellant John L. Boland.

*Bryan, Williams, Cave & McPheeters, Thomas S. McPheeters, George W. Simpkins* and *Thomas S. McPheeters, Jr.,* for respondents.

*Ryland, Stinson, Mag & Thomson, Roy B. Thomson* and *Lawrence R. Brown amicus curiae.*

DALTON, C.—This is an action in equity to surcharge the defendants, trustees of a trust estate of which plaintiffs are beneficiaries, for loss suffered by the alleged improper retention of certain stock and bonds issued by the St. Louis-San Francisco Railway Company (hereinafter referred to as Frisco) and owned by the estate. The trial court found that the trustees should be surcharged $37,728.25 on account of loss of principal by improper retention of the stock and bonds and $21,209.62 for loss of income. The court taxed the costs, including attorneys' fees for $7500.00, against the trustees, individually. Said defendants have appealed.

The trust was created in 1919 by Mrs. Catharine M. Boland for the benefit of her daughter Julia Eleanor Boland, named as life beneficiary, and certain contingent remaindermen. Pursuant to the terms of the trust instrument 329 shares of common stock of the St. Louis-San Francisco Railway Company of $100 per share par value (prior to 1921 it was in the form of voting trust certificates for common stock), and twenty $1000.00 Prior Lien Mortgage Five Per Cent Bonds, Series B, of the same company, were delivered to the defendant John L. Boland and the Mercantile Trust Company. In May, 1929, the latter company consolidated with the Bank of Commerce Trust Company to form defendant, Mercantile-Commerce Bank and Trust Company, hereinafter referred to as Trust Company. Defendant, John L. Boland is a son of Catharine M. Boland and a brother of plaintiff, Julia Eleanor Boland.

736

The trust instrument, dated November 10, 1919, contained the following provisions: "The Trustees shall hold said property and such other property as they may subsequently acquire pursuant to the powers and authority herein given to them (all of which said property, for convenience, will hereinafter be referred to as the 'Trust Estate') and any increment thereto, with full power to sell, exchange, lease, encumber or dispose of all or any portion thereof, in such manner and upon such terms and conditions as to said Trustees may seem desirable; and the Trustees shall keep such trust funds at all times invested in safe income-bearing securities *or other property,* and shall have full power to invest and reinvest said trust estate and the proceeds of the sale of any portion thereof in such stocks, bonds, securities or other property, real or personal, as to said Trustees may seem suitable, and to change investments and to make new investments from time to time as to said Trustees may seem necessary or desirable. . . . *Said Trustees shall have further power to continue to hold any stocks or other securities or investments which they originally receive hereunder, so long as they may consider the same desirable investments regardless of whether such stocks, securities or investments are in law proper investments of trust funds.*" (Italics ours.)

At the time of the creation of the trust, the Frisco stock and bonds were worth approximately $20,497.75. The trustees from time to time elected to retain these securities and now have them in their possession. The market value of the stock and bonds fluctuated, but ultimately advanced until in 1929 their approximate market value was $63,957.00. During 1925 to 1931, inclusive, the stock (which had a market value of $6086.50 on November 10, 1919.) paid dividends for a total of $15,216.25 and the right to subscribe for additional stock was sold for $1406.81. The last dividend on common stock was paid January 1, 1931. Interest was paid on the bonds at the agreed rate of five per cent until July 1, 1932. Beginning in the fall of 1929 the market value of stock and bonds declined, and, although rallying many times, the downward trend continued, until in 1935 the market value was approximately $2,529.00. In 1934, the life beneficiary, by her attorney, complained because the stock and bonds had been retained by the trustees. This suit was instituted in May of 1935. It was tried, beginning in April, 1939, and judgment was entered on April 3rd, 1941.

The petition charged that the voting trust certificates (later common stock) and the bonds were not desirable or proper investments for the funds of the trust estate when received by the trustees; that all stocks, bonds and certificates should have been sold within a reasonable time; that the 1928 recapitalization of the Frisco impaired the security of the stocks and bonds, "by increasing by a large amount the sums" the company "was obligated to pay each year as interest on its bonded debt;" that, if the stocks and bonds were de-

sirable investments before said recapitalization, they were not afterwards; that the trustees in the exercise of reasonable diligence should have sold the bonds and stocks within a reasonable time after March 1, 1928, when the bonds were above par and the stock at $101 to $122 per share; that the net earning of the railway company and market prices of the bonds declined in 1930 and 1931; that in the last part of 1930 net earnings were not enough to pay fixed interest charges; that in 1931 fixed interest charges were not earned; that money was borrowed in 1930 to pay dividends; that market prices of the stock and bonds did not decline as rapidly as net earnings; "that said facts were known by said Trustees or would have been known by said Trustees if said Trustees had exercised reasonable care;" that in the exercise of reasonable care the trustees should have sold the bonds during 1930 or the first three months of 1931 or in July, 1931, at 82% of face; that the stock declined in 1930 and 1931 and the trustees should have sold the stock in 1930, at $118 per share, or in the first two months of 1931, at $62 per share; and that the stocks and bonds so retained became of very small value. Plaintiffs prayed that the trustees be required to account "for the loss caused to the corpus of said trust estate by the improper retention by said trustees" of the securities mentioned.

Defendants, by answer, denied any breach of trust and alleged that the securities were not received for the purpose of sale and reinvesting the proceeds, but for the trustees to hold the securities until the trustees "should deem it advisable to exercise the discretion vested in them to sell the same;" and "that in retaining said stock and bonds said trustees . . . at all times mentioned in said petition exercised their said discretion in good faith, and with due care and diligence and with due regard to the purpose for which said trust was created as manifested by said trust indenture."

The evidence is too voluminous to attempt to set forth even by way of summaries of the facts disclosed by the many exhibits in evidence. A mere enumeration of all of these exhibits would serve no useful purpose. It is sufficient to say that plaintiffs' evidence was almost wholly documentary and presents a detailed picture of the financial structure and history of the Frisco from 1916 to 1932. The evidence includes a record of stock market prices for the securities here involved from December, 1919, to April, 1935, inclusive; also, certain annual reports of the Frisco to its stockholders and published monthly statements; detailed descriptions of Frisco securities and properties, mileages, etc., at different periods; statements of assets and liabilities, earnings and expenditures of the Frisco for various periods; records of the Interstate Commerce Commission with reference to issuance of stock by the Frisco, the valuation of its properties and its recapitalization, including orders, findings and dissents; tabulations and analyses of earnings and fixed charges at various periods; the

coverage of fixed charges; comparative tables showing market prices, and earnings and dividend records of certain railroads, utility and industrial stocks; and excerpts from issues of Moody's Investor's Service, a service which it is admitted "had quite a circulation" from January, 1929, through 1931. This Service, from time to time between January 10, 1929, and October 10, 1931, criticized the securities of the Frisco and its financial structure, earnings, and certain alleged unfavorable aspects in the territory served, prophesied possible declines in earnings and in price levels of securities, and recommended sale of Frisco securities and investment in certain recommended securities.

Defendants' evidence also consisted of much documentary and statistical information, including the following: A statement showing the funded debt and capital stock outstanding of the Frisco (showing also interest requirements) from 1916 through 1932; certain annual reports of the Frisco to its stockholders; a description of the funded debt of the Frisco; a consolidated income account of the Frisco for 1916 to 1931, inclusive; monthly price ranges of Frisco stock and prior lien B5s from 1916 to 1932, inclusive; a tabulation showing price ranges of common stocks of twelve ▮▮▮ railroads by months, for 1930 and 1931; a tabulation showing gross operating revenues and net operating income by months of twelve railroads in 1930 and 1931; an exhibit showing comparative coverage of fixed charges for twelve railroads, 1919 to 1931, inclusive; a description of the territory served by the Frisco; a condensed consolidated balance sheet of the Frisco as of December 31, 1927, 1928, and 1929; a tabulation showing the effect of the 1928 refunding of the Frisco with relation to the prior lien mortgage; a chart showing business index and Dow-Jones Industrial and Railroad stock averages for 42 years, to and including 1938; selected articles from the Wall Street Journal and the New York Times relating to the Frisco; a copy of a letter from the Frisco to its common stockholders on March 19, 1931; letters to and from Judge O'Neil Ryan who represented the life beneficiary until about 1933; a copy of Judge Ryan's letter to the life beneficiary of July 6, 1931; a detailed report on the Frisco by the head of the Statistical Division of defendant Trust Company; minutes of the Trust Committee of defendant Trust Company in this and other trust estates with reference to retaining, purchasing or selling Frisco securities; a stipulation concerning holdings of Frisco common stock by the St. Louis Union Trust Company in three trusts through the 1929-1931 period; evidence that said Trust Company held a power of attorney from the life beneficiary and received reports from defendant trustees; a list of trustees, insurance companies, estates of decedents, guardians, educational institutions and savings banks shown as stockholders of record of the Frisco on April 12, 1930, compared with a similar list as of April 9, 1932; a stipulation

with reference to bonds of all issues and preferred and common stock of the Frisco being extensively held by insurance companies in 1930 and throughout the year 1931, and lists of such holdings.

In addition to this mass of documentary evidence defendants offered as witness, defendant John L. Boland, one of the co-trustees; Joseph W. White, Administrative officer in charge of the trust department of defendant Trust Company; and Hale Towne, Chief of the Statistical Division of defendant Trust Company. The last two witnesses were examined and cross-examined at great length as to the Trust Company's method of handling the trust estate, as to why the stocks and bonds were retained rather than sold at various dates, and with reference to the exhibits in evidence. Some of the facts disclosed by the many exhibits and other evidence will be referred to in the course of the opinion.

The trial court found that by the trust instrument, the trustees "were only authorized to continue to retain them (the securities received) as long as they were considered desirable investments and *at all times the trust fund was required to be kept invested in safe income-bearing securities;*" . . . "and that if at any time it was made to appear to them, or if at any time by making reasonable inquiries and investigation it would have appeared to them, that the safety of either the Frisco stock or the Frisco bonds held by them *was endangered or was threatened* that then it became the duty of said Trustees, in the exercise of that degree of skill, care and prudence required of them by law, to sell such securities and reinvest the proceeds in other securities." (Italics ours.)

The court found that under the facts it should have been evident to the trustees during the last week in September, 1930, that the "Frisco stock did not constitute a safe investment;" that such stock should have been sold, between September 27th and October 3, 1930, when the average price was $74.25 per share; that from the facts and circumstances the trustees had warning "that the safety of the security of the Frisco bonds . . . was endangered . . . and that said bonds were in jeopardy, and it, therefore, became their duty to sell said bonds" on or about June 2, 1931, when the average price of said bonds was 66½.

We are first confronted by respondents' motion to dismiss the appeal on the ground that appellants' statement is unfair, misleading, incomplete and "fails to present all the testimony and evidence pertaining to the subject matter involved;" that it omits certain detailed matters which respondents consider important; and that it is argumentative and contains comments and conclusions. There is a further complaint that appellant, in the abstract, has set out certain testimony in question and answer form, while narrating other portions, so that it fails to give a clear picture of what took place. An additional abstract, setting out in question and answer form certain direct and

▮▮▮▮▮

cross-examination of witnesses, has been filed by respondent. ▮▮▮▮ Objection is also made that a large part of the argument of respondents' counsel in connection with certain excluded evidence is excluded from the record, while more of the argument of appellants' counsel is set out. A part of the difficulty as to the statement arises from the type and kind of case presented and from the difference in viewpoint of the parties with reference to the facts in evidence. We are of the opinion that the statement and abstract were sufficient. The motion is overruled.

In the consideration of this case we must first determine the duties and obligations imposed by the trust instrument. Respondents take the position that the "authorization (contained in the trust instrument) did not permit the Trustees to invest in or to hold stocks or bonds unless such stocks or bonds were of a kind and character that they should be classified as 'safe income-bearing securities;'" that this requirement applied to securities originally received thereunder; that "the settler desired the trust fund at all times invested in safe income-bearing securities;" that "the Prior Lien Bonds held in this trust . . . in 1931 . . . became not only not 'safe' securities; but definitely dangerous securities for a trust estate;" and that "the stock of the Frisco could never be properly classified as an investment stock as it had none of the characteristics which an investment stock must have."

We think it is apparent from the 16-page decree of the trial court and from a study of respondents' brief and argument that both take the position that the last quoted sentence, supra, of the trust instrument (with reference to "securities or investments which they originally receive hereunder") has no legal significance whatsoever; and that this case must be considered in exactly the same manner as if said last quoted sentence had been wholly omitted from the trust instrument. It further appears from respondents' application for attorneys' fees that the form of the decree was drafted by respondents' counsel and it corresponds with respondents' theory. Respondents' theory is further expressed in argument as follows: ". . . when a trust estate is threatened with immediate, impending danger, and when there was a ready market for the sale of these securities, as is not questioned here, we submit that there could be no question of dilly-dallying or waiting, but it was the Trustees' imperative duty to forthwith avoid the possibility of the complete loss of the trust estate (which happened here), particularly when the securities in the estate could have been sold for at least as much or even considerably more, than the securities were worth when they were originally received." In other words respondents (1) construe the trust instrument as requiring the immediate sale of any security that is not "a safe income-bearing security" even though originally received thereunder, and (2) ignore the provision authorizing the trustees to hold,

so long as they consider them desirable investments, the securities originally received, which are not proper investments of trust funds. They construe the instrument as granting substantially no discretion to hold such securities, regardless of the "ready market for the sale of these securities." Respondents further say "the trial court in no way misconstrued the provisions of this trust." : . .

In construing the trust instrument all provisions must be read and considered and given effect, if that can be done. We think the last sentence, supra, of the quoted portion of the trust agreement expressly empowers the trustees "to continue to hold any stocks or other securities or investments which they originally received hereunder, so long as they may consider the same desirable investments, *regardless of whether such stocks, securities or investments are in law proper investments of trust funds."* (Italics ours.) ·

In the case of Fairleigh v. Fidelity National Bank and Trust Company, 335 Mo. 360, 73 S. W. (2d) 248, a trust was created in corporate stock under a will. The will contained the following provision: "My said trustees are hereby invested with full power of disposition of said trust property, and every part and parcel thereof, within their discretion, and it is my desire and wish that all investments made by me shall remain as they are at the date of my death until such time as said investments, in the judgment of my said trustees, become unsafe, unprofitable or undesirable." · The trustee retained the stock and it depreciated due to depressed business and economic conditions. After reviewing the facts, the court said: "Certainly the trustee was not an insurer nor was it required to be infalliable in its judgment or to possess and exercise powers of 'prevision or prophesy' or anticipate events not generally looked for and the mere fact that the trustee's judgment was not fully vindicated by the course of subsequent events which were not discoverable by ordinary prudence, is not a showing that the trustee failed to exercise a sound and reasonable discretion in the management of the trust. [Bowker, Trustee, v. Pierce, 130 Mass. 262; Green v. Crapo, 181 Mass. 55, 62 N. E. 956; In re Clark's Will, 257 N. Y. 132, 177 N. E. 397; Taylor v. Hite, 61 Mo. 142; In re Chapman (1896), 2 Ch. 763.] All that was required of this trustee under this will was that, in the management of the trust property which it received, it act with good faith and in the exercise of a reasonable discretion and such trustee 'acting honestly with ordinary prudence and within the limits of the trust' is 'not liable for mere errors of judgment.' [In re Chapman (1896, 2 Ch. 763).]" [See, In re Dickinson's Estate, 318 Pa. 561, 179 Atl. 443; and annotations 135 A. L. R. 1528; 122 A. L. R. 806; 112 A. L. R. 355; 80 A. L. R. 1124; 77 A. L. R. 505, 508; 37 A. L. R. 559.]

Respondents concede the Fairleigh case was properly decided, but seek to distinguish it on its facts. We think the opinion correctly

states the rule, recognized in this State, with reference to the duties and obligations of appellants under a trust provision similar to the one here. [See, Restatement of Law of Trusts, Sec. 187; Scott on Trusts, Vol. II, sec. 187. 2, p. 993.]

The chief issue, therefore, for our consideration is whether the trustees, in retaining the stocks and bonds, acted in good faith and reasonably exercised the discretion vested in them by the trust instrument; if they did so, it was all the law required.

"If by the terms of the trust the trustee is permitted, but not directed to retain such investments (investments which would not be a proper investment for the trustee to make), he is not liable for retaining them unless it is an abuse of discretion to do so." [Restatement of the Law of Trusts, Sec. 230, comment, g. p. 668.]

Respondents have presented and discussed at length certain "general basic legal principles applicable to trustees' investments," to-wit, that *in making investments* of trust funds the trustees must consider first the question of the *safety* of the investment (Cornet v. Cornet, 269 Mo. 298, 316, 318, 190 S. W. 333) and second the matter of *diversification* of such investments to distribute the risk of loss (Restatement of Law of Trusts, Sec. 228). As to care required in investments by trustees, see, Rand v. McKittrick, 346 Mo. 466, 142 S. W. (2d) 29; St. Louis Union Trust Co. v. Toberman (Mo. App.), 140 S. W. (2d) 68. We are not here concerned with the rules governing the *investment* of trust funds, but with the exercise of judgment and discretion with reference to the retention (under the terms of a particular trust instrument and the facts in evidence) of investments already made. The desirability of an investment originally received under the terms of the trust agreement was not intended to turn solely upon it being "a safe income-bearing security," but upon its desirability generally as an investment (desirability as an investment in the reasonable judgment and discretion of the trustees) regardless of whether it was suitable as an investment for trust funds.

It is conceded that the Frisco stock (formerly in the form of voting trust certificates for common stock) and the bonds in question were received by the trustees immediately upon the execution of the trust agreement. It is further conceded that said stock and bonds were not sold, but were and are now held by the trustees. We think it further appears from the evidence that such stock was not "a safe income-bearing security" at the time it was received, nor during a considerable portion of the time prior to the institution of this suit. For the purposes of this suit we may concede the same for the bonds during a portion of said time. On the other hand it is expressly conceded by the respondents that "the trustees did not consider such program ("change of investments from the Frisco bonds and stock to the bonds of other railroads or industrials") because they were so thoroughly satisfied with the safety of the Frisco securities, and they

remained satisfied with them in spite of the record of the Frisco and in spite of the specific warnings of which they then had full notice.''

Respondents' first contention is that, considering the history of the Frisco, the failure of its predecessor companies and its own record of earnings and dividends, the stock and bonds received by appellants were not then ''safe income-bearing securities'' and appellants should have sold them in a reasonable time.

The Frisco stock and bonds placed in this trust represented only about one-fifth of the Frisco securities held by Mrs. Boland. We have assumed that the stock and bonds placed in this trust were not then ''safe income bearing securities,'' nor ''in law proper investments of trust funds.'' The Frisco had never paid a dividend on common stock in its history and neither had any of its predecessor companies. The first dividend on common stock was not paid until 1925. Mrs. Boland had acquired 1007 shares of stock in the Frisco in 1909 and 1000 shares in 1910. The company, thereafter, went into receivership and was reorganized in 1916. In accordance with the plan of reorganization, upon certain payments being made, Mrs. Boland received the prior lien bonds and the common stock, a part of which was placed in this trust. The stock and bonds of this trust were first placed with John L. Boland and the Mercantile Trust Company as trustees in August, 1918. The agreement in that case contained the same provision as here involved, with reference to stocks and securities originally received thereunder. The stock and bonds were held by the trustees under that trust until the trust was revoked and the present trust created in November, 1919. We cannot assume that Mrs. Boland was not familiar with the financial structure of the Frisco, or with its securities or its history, or with defendants' action and conduct, under the same provision of the prior agreement, at the time of the creation of the trust now under consideration. We cannot assume that the particular provision, supra, was included in the trust instrument by accident and without the intention that it be operative in accordance with its terms. The trust instrument expressly authorized the exercise of reasonable judgment and discretion by the trustees in the determination of whether said stock and bonds should be retained as ''a desirable investment'' and regardless of the character of such securities as lawful investments for trust funds, or as safe income-bearing securities. Respondents concede that the purpose of creating the trust was ''to secure the management and control of Julia's property by an institution especially organized and chartered for that purpose.''

A further reason urged for the early sale of the Frisco stock and bonds was the low valuation placed upon the Frisco by the Interstate Commerce Commission, as compared to the outstanding securities of the Frisco. On January 7, 1925, a tentative valuation of $186,337,063.00 as of June 30, 1918, was announced. As of December

31, 1919, the outstanding securities (stock and bonds) of the Frisco aggregated $318,926,989.00. The tentative valuation was protested and was subsequently raised to $218,000,000.00 in 1933. The valuation did not include changes and improvements since June 10, 1918. It was made for the purpose of the recapture provisions of a Federal Statute, 49 U. S. C. A., sec. 15a, which provided for the recapture of one-half of all earnings in excess of 6 per cent on the valuation fixed. The valuation was made in expectation of excess earnings and not losses. When the tentative valuation was announced on January 7, 1925, the market value of the Frisco stock held in this trust estate stood at 57½ low and 62¾ high. After publicity was given to the tentative valuation, the Frisco common stock continued to advance until, in August, 1929, it was listed low 124, high 133¾. In January, 1925, bonds of the kind held were listed at 85¼ low, 87 high. They, thereafter, advanced to 103⅛ in September, 1929, reached the same figure in September, 1930, and were over 100 as late as February, 1931. The advance in market price of the stock and bonds is clear evidence of how investors and the public generally at the time regarded the I. C. C. valuation. According to appellants' witnesses, it was thought that it was too low and did not reflect the strength of the road. A subsequent decision of the U. S. Supreme Court was believed to cast doubt on the binding effect of the valuation. Earnings of the Frisco were considered by the trustees and also the prospects for the development of the territory served. The stock and bonds were considered desirable investments and were retained. Prior to 1928 the evidence clearly fails to show any abuse of discretion in retaining the stock and bonds. Conditions were materially improving and both stock and bonds were becoming better investments.

Respondents contend, second, that if the stock and bonds were "desirable investments" before the 1928 recapitalization of the Frisco they were not afterwards and appellants should have sold the securities in a reasonable time thereafter. Respondents still construe the words "desirable investments" to mean "safe income-bearing securities." They insist that the recapitalization adversely affected the security of the stock and bonds held by the trust estate. Respondents summarize the results of the 1928 recapitalization of the Frisco as follows: "As a result of the (1928) recapitalization the aggregate of outstanding bonds and equipment obligations (formerly $306,202,813.00) was decreased to $279,899,695.00, while the outstanding stock was increased to $114,700,600.00, or a total of approximately $394,599,000.00. The aggregate outstanding capitalization was increased more than $15,000,000.00 as a result of this recapitalization, . . .

"The plan involved the sale to the public of $99,998,000.00 of Consolidated Mortgage 4½ per cent Bonds sold by the Frisco at 94½; and also the sale of $49,157,400.00 par value of 6 per cent noncumu-

lative preferred stock sold to the public at par. Out of the proceeds of said sales the Frisco retired the following securities: $14,782,000.00 of bonds prior in lien to the Prior Lien Mortgage; $30,771,000.00 of Prior Lien Mortgage Bonds; $5,000,000.00 of short time secured notes (secured by the pledge of common stock of Chicago, Rock Island & Pacific Railroad Company); $75,739,818.00 of bonds whose lien was junior to the lien of the Prior Lien Mortgage; $7,500,000.00 par value of preferred stock.

"The Consolidated Mortgage was given a lien subordinate to the lien of the Prior Lien Mortgage, but there was pledged to secure the Consolidated Mortgage $20,512,500.00 of Kansas City, Fort Scott & Memphis Railway Company Refunding Mortgage Bonds (prior lien to the Prior Lien Mortgage) and $47,630,000.00 Prior Lien Mortgage Bonds.

"There was a reduction in interest and dividend charges which were prior to the common stock of approximately $390,000.00. As against that, however, there was a substitution of approximately $100,000,000.00 of bonds having a fixed interest charge, and there were retired only $50,000,000.00 of fixed interest bearing bonds, thereby increasing fixed interest charges as to $50,000,000.00 of additional bonds, which, if not paid, would be a default resulting in receivership and foreclosure . . .

"As against the saving of approximately $390,000.00, in interest charges (if the Railroad operated at a profit), there would be added as a prior charge against its revenues Federal corporate income taxes at the rate of 12 per cent and Missouri income taxes at the then rate of one per cent. Figured on the basis of the net earnings of the Frisco applicable to dividends during the year 1927, just preceding the recapitalization, these additional income taxes would have imposed an additional burden of approximately $348,000.00 against the railroad's earnings. . . . A further effect of the recapitalization was to increase the disproportion between the capitalization of the Frisco and the valuation placed thereon by the Interstate Commerce Commission. The plan involved the issuance of $15,000,000.00 of additional capital securities as against which by reason of the discount of the bonds the Railroad obtained less than $9,000,000.00 additional cash" (to be available for capital expenditures and other corporate purposes).

Respondents say the recapitalization should have been considered by the trustees as detrimental to the securities held by them because (1) the new consolidated mortgage bonds were fixed interest bearing bonds on which interest had to be paid, increasing fixed charges, (2) there was "a dilution of the security" of the bonds held by the trustees and (3) there would be an increase in income taxes to overcome the benefits from decreased interest payments.

The plan for the 1928 recapitalization had the approval of the Interstate Commerce Commission. On March 12, 1927, the Frisco was authorized to issue the $15,096,240.00 of common stock, above referred to, to be sold at not less than par and dividends, but the payment of 2½ per cent commission on the par value of the stock for such sale was authorized. Commissioner Eastman dissented from this order on the ground of disparity between the tentative valuation of the Frisco and its capitalization.

The report on recapitalization, dated May 2, 1928, states: "The applicant proposed to issue and pledge the foregoing amounts of securities (fully set out) for the purpose of simplifying its capital structure, providing for 1928 maturities, reducing the ratio of funded debt to capital stock, and reducing interest charges. . . . The readjustment of the applicant's financial structure, as proposed, will result in an improvement over the present capitalization . . ." The reasons were then stated. The commission then ▇ found that the refinancing arrangements requested "are for lawful objects within the applicant's corporate purposes, and compatible with the public interest, which are necessary and appropriate for and consistent with the proper performance by it of service to the public as a common carrier, and which will not impair its ability to perform that service, and are reasonably necessary and appropriate for such purposes." The report was followed by an appropriate order. Commissioner Eastman dissented on the ground that so comprehensive a readjustment of capitalization, involving an increase of fixed charges, should not be approved until the final results of the valuation of applicant's property was before the Commission.

The ratio of Frisco bonds to stock before the 1928 recapitalization, was approximately 81 to 19, but after the recapitalization the financial set up was approximately 71 per cent bonds to 29 per cent stock. Appellants' witness White said the proper ratio was 60 per cent bonds, and 40 per cent stock, "somewhere in that neighborhood; 60 to 70 per cent bonds and the balance of stock." The granting of permission for the 1928 Recapitalization did not materially affect the market price of the securities held by the trustees. In May, 1928, the stock was listed at 116-121¾ and the bonds at 101⅛-103⅛. In August, 1929, the stock was listed at 124-133¾ and the bonds 98¼ to 101. There was evidence that the recapitalization was considered favorable at the time; and that it was thought to be beneficial to the common stock. The trustees did not sell because of the established earnings of the Frisco and the dividends being paid on the stock.

We think that respondents' criticism of the 1928 recapitalization is largely based upon what has since happened and not upon what could then be foreseen. The recapitalization was not intended for a severe and continuing financial depression with greatly reduced earning, a thing not then foreseen. It might have been fine, except for the

calamity which happened. The evidence fails to show any abuse of discretion in failing to sell the stock and bonds on account of the 1928 recapitalization and there is no evidence that anyone even criticised the plan at the time, except as appears by the Eastman dissents.

■ Respondents contend (third) that, in view of the weak financial structure of the Frisco, the decline of its earnings to a point where fixed charges were not earned, the decline in the market value of its stock and bonds in 1930 and 1931, the payment of unearned dividends and other facts shown by the documentary evidence, the appellants in the exercise of ordinary care should have sold the Frisco stock and bonds in 1930 or 1931, as mentioned in the petition.

It would be impossible in the space at our disposal to review the evidence on this issue, or to describe general economic conditions affecting earnings of other corporations and their stock and bonds as shown by the record. Even more difficult would be a statement of the testimony reflecting the attitudes and beliefs of the trustees and others at the time with reference to the on-coming economic depression. It is clear that it was considered only a temporary matter. It was thought in 1931 that, we were in the depth of the depression; that conditions could not get any worse; and that the securities should not be sacrified. The period was considered the "blackest depression" the country had known. It was a "terrible period," a "dangerous period." The trustees considered sales, but didn't feel that there was anything else that they could buy that would not be speculative to recover the losses in value of the Frisco securities. Each month they expected conditions to improve. It was the general feeling at the time.

The freight revenues of the Frisco were $70,797,600.00 in 1925, they increased in 1926, but they declined in 1927 and 1928, and were up to $70,376,000.00 in 1929. In 1930 they declined to less than $60,000,000.00 or a loss of $10,000,000.00 in one year. Passenger revenues in 1920 were 26 million; in 1922, 19 million; in 1925, 17 million; in 1929, approximately 11 million; and in 1930, 8 million. Total revenues, in 1920, were 92 million; in 1922, 76 million; in 1925, approximately 88 million; in 1929, 81 million; and in 1930, approximately 68 million. The revenue per mile for the Frisco system decreased from $17,644.39 in 1920 to $11,620.90 in 1929, but on the other hand there was a decrease in expenses. Increased shipments of oil were expected to off-set some of the decrease in passenger revenues, and in spite of the increase of truck and pipe line transportation.

■ The earnings of the Frisco with reference to fixed and contingent charges show times earned as follows: In 1920, 1.12; in 1925, 1.40; in 1929, 1.80; in 1930, 1.43; and in 1931, .76. The last figure, of course, was not definitely established until after the close of the year 1931, although the monthly reports showed decline. At the time, the failure to earn fixed charges, was considered serious, but was

thought to be only a temporary matter. The trustees, as respondents concede, had confidence in the Frisco, in the territory it served and in the future. They believed that earnings would come back. On July 1, 1931, some $9,300,000.00 of general mortgage bonds became due and were refinanced. The evidence shows the trustees were not alarmed by the approaching maturity of these bonds, although the matter was fully considered and, prior to maturity, it was known that the Frisco could refinance. In 1930 the Frisco paid dividends 6% on preferred stock and 8% on common stock, but these figures were in excess of earnings. Approximately $4.20 per share was earned and the balance paid from surplus. There was evidence, "that was in line with the general attitude at the time, that many companies went into their surplus to pay dividends feeling that the depression was going to lift and they would work back." In September of 1930, $10,000,000.00 of 4½ per cent Consolidated Mortgage Bonds were sold at 92¾ and interest.

In 1930 a reduction in upkeep and maintenance was made, and only one-half as much was spent for maintenance in December, 1930, as was spent for maintenance in January, 1930, but in January, 1931, there was a 50 per cent increase over December, 1930. The evidence shows that the trustees were not alarmed by the decline in maintenance expenditures, since they believed the matter only temporary. They thought the Frisco was in good shape from a maintenance standpoint. Maintenance charges were being reduced on other roads, and in any case, rails, equipment and road bed not used (by decrease in traffic and earnings) did not require so much maintenance.

Other matters pointed out by respondents are the fact that the market of Frisco securities did not decline as fast as its earnings; that sales could have been made and the money invested in stocks that in fact weathered the storm of the depression; that securities of railroads with better financial set-ups could have been obtained and innumerable other steps could have been taken so that, in the light of what has since happened, the loss would not have resulted.

In a consideration of the evidence presented, we must keep in mind that we are not called upon to weigh and consider the evidence with reference to selling or retaining the Frisco stock and bonds in the sense of substituting our judgment for that of the duly appointed trustees, nor may we view the exercise of their judgment and discretion in the light of what has since happened. On the other hand, in considering the action and conduct of the trustee in holding the said stock and bonds we must look to the facts and circumstances existing from time to time in order to determine whether the trustees reasonably exercised their discretion in the light of facts and issues as presented at the time, that is, without aid of the retrospective view, which view we now enjoy and which so clearly and forcefully appears from the record in this case. [Chemical Bank & Trust Co. v. Reynaud,

150 Misc. 821, 270 N. Y. S. 301, 303, affirmed 271 N. Y. S. 952, affirmed 266 N. Y. S. 484, 195 N. E. 164; Bowker v. Pierce, 130 Mass. 262; Matter of Clark (In re Fulton Trust Co.), 257 N. Y. S. 132, 136, 177 N. E. 397, 77 A. L. R. 499, reversing 136 Misc. 881, 242 N. Y. S. 210; Green v. Carpo, 181 Mass. 55, 62 N. E. 956, 958; In re Westfield Trust Co., 117 N. J. Eq. 429, 176 Atl. 101, 103.]

 Respondents finally contend that considering the record as a whole it "shows negligent administration by the trustees of their trust; that the facts show such "a complete lack of *intelligent* attention as to raise an inference of bad faith;" and that the record shows a "complete failure to exercise the prudent judgment and discretion required of trustees, enlightened or otherwise." We have noted that the petition charged that the securities were not desirable or proper investments for trust funds; that appellants knew or should have known the facts; and that in the exercise of reasonable diligence the trustees should have sold same and avoided the loss suffered. No evidence of lack of attention was offered by respondents, although such was attempted to be shown (but without success) by the cross-examination of appellants' witnesses. Respondents seek to shift the burden to appellants to prove the reasonable exercise of their discretion at all times throughout the entire history of the trust. They complain bitterly of the trustees' failure to produce written evidence of whatever "consideration or thought" was given to the trust estate, and the written data, records and analyses upon which the trustees acted from time to time in reaching decisions to retain the stock and bonds. They say there is no showing that the members of the Trust Committee in their frequent discussions about the Frisco knew anything at all about the Frisco other than what anyone could read in the newspaper. Respondents further insist that the trustees cannot excuse or absolve themselves from liability unless they can show that they fully discharged the trust obligations imposed upon them. No authorities are cited on the proposition that trustees must preserve written evidence to show that they have properly exercised the discretion vested in them or that (under the facts in evidence) the burden rested upon the trustees to show faithful performance of their trust. "The presumption is that the trustee has acted in good faith, and has done his duty and the burden is on the plaintiff to allege and prove the contrary." [Offenstein v. Gehner, 223 Mo. 318, 324, 122 S. W. 715; 65 C. J. 1053, sec. 984.] Apparently there is no legal duty upon the trustees to preserve written evidence showing that they have properly exercised their discretion. [37 A. L. R. 568.]

 We think the evidence shows that appellants gave sufficient and proper attention to the handling of this trust (to even summarize the evidence would unduly extend this opinion); that the Trust Committee and officers of appellant Trust Company were qualified and competent men; that those in charge of the Trust estate were fully

advised as to the facts with reference to the history of the Frisco and the territory served by it; and that they were continuously familiar with its financial structure and securities, the changes in its financial set up, its earnings and expenses, its dealings with the Interstate Commerce Commission and the orders entered, the changes in market of the several securities and other general conditions.

Respondents wholly failed to show any lack of diligence or attention to the trust estate or that appellants were not from time to time fully aware of the facts upon which respondents contend the appellants should have reached a different conclusion and should have sold the stock and bonds at the times specified in the petition. In support of their theory that the facts disclosed by the record required the sale of the securities, respondents rely wholly upon an examination of financial reports, facts and figures (which are most difficult to examine, except in the light of what has since happened), plus the dissents and criticism of the Frisco by Commissioner Eastman and recommendation of the one list, Moody's Investor's Service. The Interstate Commerce Commission, however, approved; a single commissioner dissented. According to appellants' evidence Moody's Investor's Service, a New York publication, was just what it purported to be, a list for investors, for the individual business man "interested in capital changes by way of appreciation" and it was not a service for guidance of trustees. While this service was criticising the Frisco from an *investment* viewpoint, there were "innumerable articles . . . that spoke of the very favorable outlook that Frisco had." On April 13, 1931, Moody's Investor's Service advised against purchasing Frisco Prior lien five per cent bonds, because of decreased earnings of the Frisco. On the same day the Trust Committee of the appellant Trust Company reached the conclusion that it was inadvisable to dispose of such bonds, and we think the evidence fails to show an unreasonable exercise of discretion. In retrospect it appears that subsequent events have proven the views of Eastman and Moody's Investor's Service to be correct, however, that could not have been determined at the time and the mere fact that the prophesy of one happens to be right is not basis for liability against one whose erroneous judgment has resulted in loss to the estate. The evidence disclosed that the error of appellants was a most common one at the time in financial circles. [See, In re Pettigrew's Estate, 115 N. J. Eq. 401, 171 Atl. 152, 155, affirmed 116 N. J. Eq. 566, 174 Atl. 478.] The evidence shows the extent to which stock and bonds of the same issues were held by large financial institutions, trustees, Trust Companies, insurance companies, educational institutions and others throughout the country and that, for the most part, such stock and bonds were held throughout the period here under consideration.

It is apparent from the record that a great many factors were involved and were for consideration and were considered by the trustees

in connection with the exercise of their discretion to retain rather than sell the stock and bonds. The weight and value to be given to those several factors was within the discretion of the trustees and we cannot say that their exercise of the discretion vested in them under the trust instrument was unreasonable.

 It may be conceded that in due time the trustees reached the conclusion that the Frisco stock and bonds were not desirable investments, but what to convert the same into, and when to do so, was still a question for the trustees considering the circumstances then existing. It appears that the trustees retained the investments, awaiting what they considered a proper time to sell, and their retention of the securities was not due to any lack of attention, but was wholly based upon the actual consideration of existing conditions. [Restatement of the Law of Trusts, Sec. 231 c., pp. 675, 676; Scott on Trusts; Vol. II, Sec. 230.2, pp. 1242, 1244.]

While purporting not to do so, respondents in fact disregard the terms of the trust instrument and complain (1) of the conclusions reached by the trustees in the exercise of the discretion vested in them and (2) particularly of the results obtained. Respondents apparently mean by ''intelligent consideration'' and judgment, being able to see in the facts at the time what all can see in them now, when viewed in retrospect. Reasonably prudent men, however, did not see in advance what they now can see. Respondents say: ''We have never contended and do not contend that the Trustees are or should be gifted with hindsight after the event. We have never contended and do not contend that this case involves or requires the substitution of the judgment or discretion of the court for that of the Trustees. We have never contended and do not contend that the Trustees should be charged as guarantors or held responsible for errors in judgment, provided that judgment was exercised after the Trustees had first acquainted themselves with, and given intelligent consideration to, all the facts necessary for the exercise of that judgment, and had then exercised it with prudence and skill, and *having in mind at all times the safety of the trust* which had been committed to their care. We do say, however, that these Trustees were charged with the duty of acquainting themselves with all the facts and circumstances necessary to determine whether or not the safety of their trust was imperiled and to make whatever other inquiry was necessary to enable them to form an intelligent judgment. . . . We say that it is not sufficient for the Trustees to merely read the published data in regard to Frisco securities, that *the Trustees should have considered that data intelligently and noted the danger and risk in regard to these securities which that data would have revealed to any intelligent consideration.* In other words, these Trustees should have done more than read the data—*they should have thought about it—and drawn conclusions from what the data would have disclosed,* . . . they

should have exercised it with 'prudence and skill.' A trustee cannot exonerate itself by merely making general statements that 'we carefully considered the situation and decided it was best not to sell these securities.' . . . They (the trustees) held these securities for twenty years from the time received in 1919 until 1939 and until the trust estate, to all practical intent, was completely wiped out. . . . She (Mrs. Boland) could just as well, or better, have turned the securities over outright to her daughter. She couldn't possibly have done worse than the Trustees did, and it is a fair inference that she would have done much better.'' (Italics ours.)

Having carefully considered the entire record in this case in the light of all of the authorities cited, we have reached the conclusion that the record fails to show any abuse of the discretion vested in the trustees. The decision reached from time to time to retain the stock and bonds, in view of the particular facts and circumstances then existing, was not beyond the bounds of a reasonable judgment. The trustees acted with ordinary prudence and within the terms of the trust. Respondents are not entitled to recover.

The judgment is reversed. *Hyde* and *Bradley, CC.,* concur.

PER CURIAM:—The foregoing opinion by DALTON, C., is adopted as the opinion of the court. All the judges concur.