NAT KOPLAR v. BARNET L. ROSSET, Individually; BOYLE G. CLARK, Individually; BARNET L. ROSSET and BOYLE G. CLARK, Voting Trustees; METROPOLITAN TRUST COMPANY, Individually; METROPOLITAN TRUST COMPANY, Corporate Trustee; and MARMADUKE APARTMENTS, INC., Appellants, LAWRENCE E. MAHAN, Voting Trustee, and HUGH MONNIG, Co-Trustee, Defendants.—No. 39714. 196 S. W. (2d) 800.

Court en Banc, September 9, 1946.

Rehearing Denied, October 14, 1946.

498

*Thompson, Mitchell, Thompson & Young, Forder Buckley* and *William H. Becker* for appellants.

500

*J. L. London* for respondent.

502

*Goodbar & Ferriss* and *Henry T. Ferriss* for defendant-respondent Lawrence E. Mahan.

*Hugo Monnig,* co-trustee, pro se.

TIPTON, C. J.—This is a suit in equity instituted by respondent Nat Koplar against appellants Boyle G. Clark, Barnet L. Rosset, the Metropolitan Trust Company, a corporation, the Marmaduke Apartments, Inc., a corporation, Lawrence E. Mahan and Hugo Monnig. Clark, Rosset and Mahan are trustees of a voting trust, owning all the stock of the Marmaduke Apartments, Inc., established pursuant to a plan of reorganization approved by Division No. 2 of the circuit court of the city of St. Louis. Clark and Rosset were

also sued individually. The Metropolitan Trust Company, an Illinois corporation, was trustee under a deed of trust and chattel mortgage dated July 1, 1936, to secure the payment of bonds in the sum of $426,500 issued pursuant to the plan of reorganization. Monnig is a co-trustee under the same deed of trust and chattel mortgage. The Marmaduke Apartments, Inc., is a Missouri corporation formed pursuant to the plan of reorganization and is the owner of the equity in the building and contents known as Marmaduke Apartments which is located in the city of St. Louis. This case was tried in Division No. 3 of the Circuit Court of the city of St. Louis.

The decree of the trial court covers many points, but the principal points are that (1) the court found that it had jurisdiction of the subject matter and parties; (2) that respondent, the holder of voting trust certificates of the Marmaduke Apartments, Inc., is the equitable owner of 65% of the stock of that corporation and is entitled to maintain this action; (3) that the court found the issues in favor of respondent and against appellants Rosset and Clark, individually and as trustees of the voting trust, and the Metropolitan Trust Company; (4) that the primary purpose of the voting trust agreement was to protect and enforce the rights of the bondholders at the time of the formation of the voting trust agreement, and provides that "this agreement shall terminate upon the payment to the holders thereof of all sums due upon the first mortgage income bonds of the company"; (5) that under the voting trust agreement, paragraph 12, before the voting trustees can sell or mortgage the property of the corporation they are required to give written notice to all holders of voting trust certificates of the proposed sale or mortgage; (6) that appellants Rosset and Clark, two of the voting trustees, have refused to submit the "plan proposed by the plaintiff (respondent) for the payment of all of the bonds now outstanding"; (7) that such plan is feasible and workable; (8) that the refusal of Rosset and Clark, voting trustees, to submit respondent's plan of refinancing to the holders of the trust certificates was arbitrary and unwarranted, and that they have acted against the best interests of the beneficiaries of the trust, and that they are removed as voting trustees and temporary trustees will be appointed in their place; (9) that the court is not warranted in appointing a receiver; (10) that the salary of $1,000 a year paid to Rosset as president of Marmaduke Apartments, Inc., was unwarranted and should be refunded; (11) that the Metropolitan Trust Company should be removed as trustee under the first mortgage deed of trust, or as depositary and registrar; (12) that voting trustee Mahan is entitled to have his legal expenses in defending this suit charged against the voting trust; (13) that defendant Monnig is entitled to have his legal expenses charged against the voting trust; (14) that respondent Koplar brought this suit on behalf of himself and all other trust certificate holders, that the benefits of the suit inure

to the benefit of Marmaduke Apartments, Inc., as well as the bondholders, and that Koplar is entitled to have his legal expenses paid out of the trust estate; (15) that appellants Rosset and Clark should be removed as trustees, stockholders, officers and directors of Marmaduke Apartments, Inc., and be enjoined and restrained from taking any further action in respect thereto, and that the Metropolitan Trust Company be enjoined from acting further as trustee, depositary and registrar under the deed of trust securing the first mortgage bonds; (16) that appellants, individually and as voting trustees, be ordered to surrender and deliver the books and records of the corporation and of the voting trustees, that any action taken by them providing for legal and other expenses in connection with this suit is declared to be null and void; (17) that the cost of this suit be adjudged against appellant Rosset; and (18) that the court should retain jurisdiction for the purposes of carrying out this decree. From this decree appellants Rosset and Clark have duly appealed.

The essential facts as shown by the record are as follows: The Marmaduke Apartments, 2710 South Grand Boulevard, St. Louis, Missouri, were owned on September 1, 1928, by the Grand Boulevard Investment Company. The common stock of this corporation was owned by Carl Anscheutz and family. On that date the Grand Boulevard Investment Company executed a deed of trust and chattel mortgage upon this property to secure a bond issue in the sum of $475,000. The trustee under this instrument was Herman J. Strauss of Chicago, Illinois, and J. E. Lehman of St. Louis was the cotrustee. The bond issue was underwritten by Strauss Brothers Investment Company of Chicago, Illinois. The mortgagor defaulted in the payment of bonds and interest on August 10, 1932, and the trustees under the powers granted them declared the unpaid principal of $463,000 due.

About January 21, 1931, a general bondholders' protective committee was created to act on behalf of the holders of the first mortgage bonds underwritten by Strauss Brothers Investment Company, including the Grand Boulevard Investment Company. Appellant Rosset was appointed chairman of the committee. The Boatmen's National Bank of St. Louis and a Chicago bank were designated by the committee as depositaries for the committee under its deposit agreement. Upon failure of the Chicago depositary, the Metropolitan Trust Company was appointed as successor depositary. About 99 per cent of the stock of this trust company was owned by appellant Rosset and his family.

On March 15, 1934, Strauss and Lehman as trustees filed suit in the circuit court of the city of St. Louis for foreclosure of the deed of trust and chattel mortgage against the Grand Boulevard Investment Company. This suit was assigned to Division No. 2 of that court. A judgment of foreclosure was entered in that court on May 6, 1936.

The bondholders' protective committee intervened in the foreclosure proceedings, submitting for the court's approval the committee's deposit agreement and the plan of reorganization, which was by the court approved. James McClellan, a nominee of the bondholders' protective committee purchased the apartment at the foreclosure sale for $85,000, which left a deficiency of $476,905.54.

In accordance with the contract between the stockholders of the Grand Boulevard Investment Company and the bondholders' committee embodying the plan of reorganization and pursuant to the order of the court, the following plan of reorganization was consummated.

A Missouri corporation was formed to hold title and operate the Marmaduke Apartments purchased at the foreclosure sale, which was named the Marmaduke Apartments, Inc. 10,663 shares of no-par capital stock were issued to the trustees of the voting trust provided for by the plan. On July 1, 1936, this corporation issued income bonds totaling $426,500, bearing 5 per cent interest and maturing July 1, 1951. Each participating bondholder of the Grand Boulevard Investment Company received new bonds in an amount equal to the principal of the bonds deposited by him. The participating bondholders also received voting trust certificates representing 40 per cent of the stock of the new corporation, or 4265 shares. These certificates were marked Prefix ''A''. This was done to compensate the old bondholders for defaulted interest on the old bonds. Each participating bondholder received a certificate representing one share for each $100 of principal bonds deposited. The stockholders of the Grand Boulevard Investment Company received voting certificates representing 60 per cent of the capital stock of the new corporation, or 6398 shares. These certificates were marked Prefix ''B'', and were subject to purchase for $1,000 by the voting trustees in event that the unpaid bonds exceeded in principal the sum of $255,900 on July 1, 1951, the maturity date of the new bonds.

The bondholders' committee was authorized to and did name two trustees, Barnet L. Rosset and Boyle G. Clark. The stockholders of the Grand Boulevard Investment Company were entitled to name a third trustee and Otto J. Dickmann was named. Rosset and Clark were removable by the holders of two-thirds in principal amount of the income bonds, while Dickmann was removable by the holders of a majority of the shares represented by ''B'' trust certificates. The voting trustees were given exclusive power to vote the stock under the trust without limitation by the holders of the trust certificates. Power to mortgage or sell the trust property was given to the trustees subject to a veto of the holders of the trust certificates representing 35 per cent of the capital stock of the company after notice of the proposed action. A sinking fund was set up for the purchase and retirement of bonds before maturity. Into this fund there was allocated annually a portion of the net income after paying 3 per cent

interest on the bonds, not to exceed one-fourth of the total net income. Under the deed of trust and chattel mortgage executed by the new corporation, the Metropolitan Trust Company of Chicago, Illinois, was named trustee and Hugo Monnig was named co-trustee.

Respondent Koplar acquired all the ''B'' voting trust certificates as an investment in August, 1943, for $35,000. At the time of the trial he owned $14,000 worth of the bonds and 500 shares of the ''A'' certificates. In other words, he owned 65 per cent of the ''A'' and ''B'' certificates.

On May 12, 1944, at a meeting of the voting trustees and directors of the corporation, counsel for respondent Koplar proposed that the corporation borrow $315,000 at 4½ per cent, payable in 17 years, for the purpose of refinancing the outstanding bonds. On June 1 of that year the outstanding bonds would be only $321,000, and by letter dated May 17, 1944, respondent's counsel proposed to the trustees the following plan of refinancing:

''The commitment that I refer to is dated February 29, 1944, addressed to Nat Koplar and provides for an authorized loan of $315,-000.00 secured by first mortgage on Marmaduke Apartments, and a chattel mortgage covering the furniture, fixtures and equipment, with the right to assign it. The mortgage matures in seventeen years from the date of closing; bears interest at the rate of 4½ per cent payable monthly; ▋ the payments aggregate $26,544.96 annually, in monthly installments of $2212.08 each and commences one month after closing; interest and amortization payable on the first or fifteenth of the month, optional with the borrower, but to be fixed in the mortgage; the owner to have the privilege of increasing the amortization in any one year to an amount not to exceed $63,000.00 without penalty, and to have the further privilege, after the first five years, of liquidating the indebtedness in full upon payment of a penalty of 1% of the outstanding principal. Questions regarding the title, form of note and deed of trust, etc., are subject to the approval of counsel for the insurance company. The expenses, including title, insurance and survey are to be borne by the borrower, the fee of counsel for Home Life Insurance Company is to be borne by the Insurance Company. It also called for fire insurance in the amount of $358,000 on the apartment house and $24,000 on the garage, with an 80% co-insurance clause, boiler insurance $50,000. The right is reserved to cancel the commitment if the loan is not closed by August 1, 1944.

''With reference to your query as to how Mr. Koplar intends to finance the difference between the amount of the loan, namely, $315,-000 and the other expenses which will be necessary in order to refinance, I submit the following: From your statement of Saturday morning, there will be a balance of bonds outstanding on June 1, 1944, in the amount of $321,000. The commission on the loan will be 1% or $3,150.00. There probably will be some additional expenses.

Mr. Koplar is prepared to put up the above difference and whatever these expenses may amount to as a long-time unsecured loan (spread over a reasonable number of years) to the corporation at 4% interest, payable $100.00 monthly. In this way there will be no second mortgage on the property.''

The trustees and directors considered the proposal to refinance on May 22, 1944, and refused to submit it to the security holders but, instead, passed a resolution looking to the sale of the property. Pursuant to this resolution, the trustees undertook to receive offers for the sale of the corporate properties for submission to the security holders. Arthur Fischman offered to purchase the property for $400,000, which offer was approved by the trustees for the purpose of submitting to the certificate holders. The resolution permitted a sale at a higher figure if one was received but gave Fischman the right to meet the higher offer.

Respondent had testimony to show that the administrative and corporate expenses were excessive; and that 5 per cent paid to the Dickmann Company and Anscheutz for rental management was excessive and out of line with that paid by other apartments comparable to the Marmaduke Apartments. Appellants Rosset and Clark testified that they considered the corporate and administrative expenses to be reasonable and that no one complained until after the November 1943 meeting at which time respondent requested that he be given the contract for the rental management. Appellant offered evidence that the fee of 5 per cent of gross income paid for the rental management of the properties was the fee fixed by the St. Louis Real Estate Exchange.

Rosset and Clark both testified that they had not submitted respondent's plan of refinancing because they considered it contrary to the best interests of the security holders, that they believed the best interests of the security holders required that the property be sold and all funds distributed; and for these reasons they voted to submit to the security holders the sale of the property rather than the refinancing plan of respondent. Defendant Mahan, the third trustee, testified that in his opinion the refinancing plan was preferable to the sale of the properties. Other pertinent facts will be stated in the course of this opinion.

Appellants contend that Division No. 3 of the circuit court of the city of St. Louis erred in rendering the judgment and decree Division No. 2 of that court in the foreclosure suit had in its decree reserved jurisdiction for further consideration of all questions, issues, amounts and things not therein disposed of and for further relief to any matters not therein specifically determined and, therefore, only Division No. 2 of that court had jurisdiction to determine respondent's suit.

The real question for us to determine is whether respondent's action is an action independent of the foreclosure suit tried in Division No. 2 of that court. If so, then appellants' objection is without merit.

We agree with appellants that when a suit is assigned to one of the divisions of the circuit court of the city of St. Louis "that division becomes as to that cause a whole court, and has as exclusive jurisdiction of it as a circuit court of an adjoining county has of a cause pending in it." Goddard v. Delaney, 181 Mo. 564, l. c. 581, 80 S. W. 886.

The only jurisdiction Division No. 2 could have retained was the carrying out of its decree. This action in no way attacks the judgment of Division No. 2, nor does it ask any relief under that decree, but is an independent action growing out of the contract which was approved by Division No. 2. It does not involve the same parties nor the same issues; therefore, appellants' contention is overruled.

Appellants contend that since the income bondholders and the holders of the "A" voting certificates were not made parties the court did not have before it all necessary parties. The petition did not ask for and the decree in no way affected the interest of the income bondholders. They could all be paid in full at any interest payment date by giving a sixty day notice under the terms of the trust agreement. The bondholders are not affected by the court's decree and, therefore, are not necessary parties. Leydon v. Owen, 150 Mo. App. 102, 129 S. W. 984.

Nor do we think the "A" certificate holders are necessary parties. The only rights they had under the trust agreement were to vote on the propositions in regard to the sale or mortgaging of the property owned by Marmaduke Apartments, Inc., and where the trustees sought to amend or alter the articles of incorporation, by an adverse vote of 35 per cent of the holders of the trust certificates they could defeat such a proposition. Neither respondent's petition nor the court decree in any manner affected these rights. On the contrary, the decree required the trustees to submit to the holders of the trust certificates for their approval the proposed plan of refinancing.

Appellants assign as error the trial court's "finding that the appellants Rosset and Clark were acting against the best interests of the beneficiaries of the trust, and erred in appointing new trustees with directions to submit a plan of refinancing because the lower court had no right to substitute its discretion for the discretion of the trustees, or to interfere with the exercise of the discretionary powers of the appellants Clark and Rosset as trustees."

Section 12 of the trust agreement provides the "trustees shall possess and in their discretion shall be entitled, except as hereinafter provided, to exercise the right to vote . . . in favor or in opposition to any resolution or proposed action . . . which may be presented at any meeting or require the consent of the stockholders of said

company. . . . It is understood that such action or proceeding may include the mortgaging and pledging of all or any part of the property of said company . . . The trustees agree that they will not . . . vote for the sale or mortgaging or pledging of all or substantially all of the property and assets of said company'' if after notice to the holders of the trust certificates, 35 per cent of them shall inform the trustees in writing of their objection thereto.

In other words, the trustees had the discretionary power to sell or mortgage all the property of the Marmaduke Apartments, Inc., if 35 per cent of the certificate holders did not object to such sale or mortgage.

The rule is well established that where discretion is conferred upon a trustee with respect to the exercise of a power, its exercise is not subject to control by the court except to prevent an abuse by the trustee of his discretion. Dickey v. Volker et al., 321 Mo. 235, 11 S. W. (2d) 278, 62 A. L. R. 858; Boland v. Mercantile-Commerce Bank & Trust Co., 349 Mo. 731, 163 ▮ S. W. (2d) 597. "The court will not substitute its own judgment for his. Even where the trustee has discretion, however, the court will not permit him to abuse the discretion. This ordinarily means that so long as he acts not only in good faith and from proper motives, but also within the bounds of a reasonable judgment, the court will not interfere; but the court will interfere when he acts outside the bounds of a reasonable judgment.'' Scott on Trusts, Vol. 2, p. 986, sec. 187.

"The court will control the trustee in the exercise of a power where he acts from an improper even though not a dishonest motive, that is where he acts from a motive other than to further the purposes of the trust. Thus, if the trustee in exercising or failing to exercise a power does so because of spite or prejudice or to further some interest of his own or of a person other than the beneficiary, the court will interpose.'' Restatement of the Law on Trusts, p. 482, sec. g.

Under appellants' plan to sell or respondent's plan to refinance this property by putting a new mortgage on the property, the holders of the income bonds will be paid in full, and when they are paid in full the trust will be terminated under section 16 of the trust agreement.

The primary purpose of the voting trust agreement was protection of the security of the income bonds. We find nothing in the trust agreement which requires the trustees to give any preference to the "A" certificate holders over the "B" certificate holders, or to manage their interests in the trust differently.

We agree with the trial court that the refusal of Rosset and Clark to submit to the holders of the trust certificates the plan proposed by respondent for the payment of all of the income bonds outstanding was arbitrary and unwarranted.

At the trial of this case appellants contended that this property should be sold and the bonds paid from the proceeds of the sale. The certificate holders who are the equitable owners of the stock of this corporation would then be paid the amount remaining after retiring the bonds for their stock. Under respondent's plan, both the "A" and "B" certificate holders would, upon their surrender, be given the stock of the Marmaduke Apartments, Inc.

Appellants' proposal to sell this property was not made until respondent had made his proposal to the trustees to refinance this property and at a time when they knew that the sale was not acceptable to respondent Koplar; they knew that he would and could veto the same because he owned more than 35 per cent of the voting trust certificates. Under these circumstances, we doubt if appellants' plan to sell the property was made in good faith. If the sale was blocked and appellants refused to submit a plan of refinancing by giving a new mortgage then the trust would continue, thus subjecting the holders of the "B" certificates to a possible loss, this for the reason that on July 1, 1951, under the trust agreement, the ":B" certificates can be purchased for $1,000 in the event the unpaid bonds exceed in principal the sum of $255,900. In 1943 respondent paid $35,000 for them.

Under appellants' proposed contract of sale of this property the trustees were to receive a net of $400,000 from Arthur Fischman with a provision that it would permit the corporation to receive a higher bid from another bidder if received at or prior to the shareholders' meeting at which this proposition is submitted, "unless the present proposed purchaser shall elect to meet such increase over a definite time specified in the contract." In other words, under this contract respondent could not buy this property at a higher price if Fischman would meet respondent's higher bid, this in the face of the fact that respondent was the equitable owner of at least 65 per cent of the stock of this corporation.

We think the reasonable inference to be drawn from appellants' insistence upon the sale of this property was that such a sale would insure the Metropolitan Trust Company's securing a 5 per cent real estate commission upon the consummation of the sale. This contract was prepared by a Mr. Kelly, an employe of the Metropolitan Trust Company, and appellant Rosset testified that the Metropolitan Trust Company would expect compensation if it produced a buyer. It should be remembered that appellant Rosset owned practically all the stock of the Metropolitan Trust Company, in fact, he and his family owned 99 per cent of the stock. Under these circumstances, Rosset's interest as a trustee is inconsistent with his personal interest. As trustee if he procured a purchaser for the trust estate he could not receive a real estate commission. If the Fischman contract was consummated he would, through the Metropolitan Trust Company, be

receiving compensation or a commission, and we think the record justified the conclusion that this is the controlling motive in his refusal to submit respondent's plan and insisting on a sale. Since the discretion he used was not solely to further the purposes of the trust but was done to further the interest of the Metropolitan Trust Company, if not him personally, we think, under the authorities above quoted, the trial court properly held that his actions were arbitrary.

If respondent's plan of redemption was accepted, the $315,000 secured from the insurance company and the balance necessary to redeem the income bonds and to pay any additional expense would be furnished by respondent, he taking a long time unsecured note for this balance. If necessary to have a refinancing, a temporary loan from the First National Bank of St. Louis could be secured in the sum of 90 per cent of the value of the income bonds and the other 10 per cent would be lent respondent on other collateral. This the First National Bank agreed to do, provided respondent had a commitment from the insurance company to take up the loan upon necessary clarification of titles and things of that nature. We think this plan complies with article II, section 2 of the deed of trust and chattel mortgage which deals with the redemption of the income bonds. This section which deals with the methods for releasing the deed of trust and chattel mortgage provides that "evidence and security satisfactory to the corporate trustee that the sums required for said purpose will be available to the corporate trustee upon the date fixed for redemption."

We agree with the trial court that respondent's plan is workable and feasible and should have been submitted to a vote of the certificate holders.

Appellant Clark testified that he would have been willing to submit respondent's proposal if respondent would not vote his certificates. This shows an arbitrary action on his part. Rosset was the dominant figure in handling the trust estate and Clark had apparently opposed him in the handling of it.

Under the trust agreement the trustees were to receive compensation in the aggregate sum of not more than $1200 a year, yet on motion of Clark in 1940 the trustees voted Rosset an additional salary of $1000 a year, retroactive to June 1, 1939, as president of the Marmaduke Apartments, Inc. We find no provision in the trust agreement which would authorize this action. Appellants argue that Rosset performed various services for the corporation between meetings of the trustees, yet on cross-examination he testified as follows: "Q. Are you able to make any distinction between the acts you did as president and your acts as a voting trustee and director? A. They are one and alike."

We are unable to find from the record anything he did as president he should not have done as trustee. If he was able to purchase sup-

512

plies cheaper than others, or if he saved the Marmaduke Apartments, Inc., taxes, he owed that duty as a trustee.

"Absolute and most scrupulous good faith is the very essence of the trustee's obligation. The first and principal duty arising from this fiduciary relation is to act in all matters of the trust wholly for the benefit of the beneficiary. The trustee is not permitted to manage the affairs of the trust, or to deal with the trust property, so as to gain any advantage, directly or indirectly, for himself, beyond his lawful compensation. . . . It is equally imperative upon the trustee, in his dealings with trust property, not to use it in his own private business, not to make any incidental profits for himself in its management, and not to acquire any pecuniary gains from his fiduciary position." Pomeroy's Equity Jurisprudence, 5th Ed., Vol. 4, p. 217, sec. 1075.

Under the record and authorities cited we think the trial court was justified in removing Rosset and Clark as trustees, and in requiring the refund of the $5,000 salary received by Rosset as president of the Marmaduke Apartments, Inc. As trustee he had no right to allow himself to be appointed an agent or servant and draw compensation in addition to his compensation as a trustee.

We also think the trial court properly removed the Metropolitan Trust Company as trustee under the deed of trust and chattel mortgage. Rosset would not consider any plan of refinancing except the sale of the property, and as we have already shown that this company is under his complete control and domination, it may not cooperate in releasing the lien on the payment of the bonds, as required under article 14, section 9 of the deed of trust and chattel mortgage.

Appellants next contend that the trial court erred in holding that they were not entitled to attorneys' fees and other expenses in connection with this suit. We have already held that their conduct in the management of this trust was sufficient to justify the trial court's removing them as trustees, so under these circumstances the action of the trial court was proper. 54 Am. Jur. 491, sec. 636; Turner v. Ryan, 272 N. W. 60, 110 A. L. R. 554.

The trial court retained jurisdiction for the purpose of making allowance to respondent for expenses incurred in the prosecution of this suit and for his counsel. This is assigned as error for the reason that respondent represented his own interest and, therefore, it is not chargeable to the trust estate. From what we have already said, we think the corporation as well as other trust certificate holders benefited by this action, therefore the trial court's action was proper. Trautz v. Lemp, 334 Mo. 1085, 72 S. W. (2d) 104; Kingston v. St. Louis Union Trust Co., 348 Mo. 448, 154 S. W. (2d) 39.

Appellants' last contention is that respondent cannot complain of any alleged irregularities occurring before he became a certificate

holder and of which he was cognizant at the time that he purchased his certificates.

Appellants rely on section 19 b of the new Civil Code which, in substance, provides that a stockholder cannot complain of alleged mismanagement occurring prior to his acquisition of the stock. A sufficient answer to this contention is that the trial of this case was commenced in the year 1944, while the new Code of Civil Procedure did not go into effect until January 1, 1945. Moreover, the acts of irregularity relied upon were continuing ones, therefore, this rule of law would not apply. Fletcher Cyclopedia Corporation, 1943 Ed., Vol. 13, p. 358, sec. 5982; Hyams v. Old Dominion Co., 113 Me. 294, 93 Atl. 747.

From what we have said, it follows that the decree of the trial court should be affirmed. It is so ordered. All concur.